# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Suzanne B. Conlon | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 7614 | **DATE** | 7/28/2000 |
| **CASE TITLE** | ANNETTE M. ALLEN, et al. vs. CHICAGO TRANSIT AUTHORITY | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] The motion for class certification [21-1] is denied. ENTER MEMORANDUM OPINION AND ORDER.

*Suzanne B. Conlon*

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | JUL 31 2000 | date docketed | |
| | Docketing to mail notices. | | | 113 |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 7/28/2000 | |
| | | | date mailed notice | |
| WS | courtroom deputy's initials | JUL 26 PM 1:55 | jad | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

Document Number

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ANNETTE M. ALLEN, SHELLEY S. BURNETTE, EARNEST LEONARD, BRIAN R. MARSHALL and RAHPRE NEWBERRY, on behalf of themselves and all other similarly situated, | ) ) ) ) ) ) | No. 99 C 7614 Suzanne B. Conlon, Judge |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| CHICAGO TRANSIT AUTHORITY, | ) ) | |
| Defendant. | ) | |

DOCKETED
JUL 3 1 2000

## MEMORANDUM OPINION AND ORDER

Annette M. Allen, Shelley S. Burnette, Earnest Leonard, Brian Marshall and Rahpre Newberry ("plaintiffs") sue the Chicago Transit Authority ("the CTA") for employment discrimination and retaliation. In their second amended complaint, plaintiffs allege they have been denied promotions, equal pay, and other substantial employment benefits by the CTA on the basis of race in violation of Title VII (Count I) and 42 U.S.C. §1983 (Count II). In Counts III-V, plaintiffs allege they were harassed in retaliation for filing discrimination charges in violation of Title VII and §1983. Plaintiffs move for class certification pursuant to Fed. R. Civ. P. 23.

## BACKGROUND

**I     Procedural history**

Plaintiffs originally filed their class action complaint November 23, 1999. Plaintiffs filed an amended complaint February 15, 2000. In their first amended complaint, plaintiffs alleged they have

been denied promotions, equal pay, and other substantial employment benefits by the CTA on the basis

of race, in violation of Title VII (Count I) and 42 U.S.C. §1981 (Count II). In Counts III-V, plaintiffs

alleged they were harassed in retaliation for filing discrimination charges also in violation of Title VII

and §1981. On April 19, 2000, this court dismissed plaintiffs' §1981 claims on the ground that §1981

neither expressly nor impliedly contains a private cause of action. This court also dismissed

Newberry's Title VII allegations of retaliation (Count V) arising before January 25, 2000 with

prejudice and Marshall's Title VII claims (Count I) without prejudice. On May 31, 2000, this court

granted plaintiffs leave to file a second amended complaint. Plaintiffs reasserted the allegations from

the first amended complaint and substituted 42 U.S.C. §1983 as the basis for their §1981 claims. The

CTA then moved to dismiss plaintiffs' §1983 claims, Newberry's claims, and to bar Allen's and

Burnette's §1983 claims as untimely. On July 24, 2000, this court dismissed plaintiffs' §1983

retaliation claims but denied the CTA's motion to dismiss in all other respects. The motion to bar

Allen's and Burnette's §1983 claims was denied. Plaintiffs move for class certification on their Title

VII and §1983 discrimination claims (Counts I and II). The CTA objects on multiple grounds.

## II     Factual background

In evaluating a motion for class certification, the court accepts the supporting allegations as

true and does not examine the merits of the case  Heastie v. Community Bank, 125 F.R.D. 669, 671,

n.2 (N.D.Ill. 1989). However, the class determination generally involves both factual and legal issues,

and may require probing behind the pleadings to determine whether the interests of absent parties are

fairly encompassed within the named parties' claims. General Telephone Co. of the Southwest v.

Falcon, 457 U.S. 147, 160 (1982); *see also* Betts v. Sundstrand Corp., 1999 WL 436579 (N.D. Ill.

2

1999) (considering evidence submitted in making class certification determination); <u>Orlowski v.</u>

<u>Dominick's Finer Foods, Inc.</u>, 172 F.R.D. 370 (N.D. Ill. 1997) (same).

### A    The parties

The CTA is an Illinois municipal corporation engaged in the business of providing public transportation in Chicago.  The CTA is generally organized into three branches: management and performance; customer service, facilities and development; and transit operations.  Each of these branches contains a number of departments.  The human resources division is within the management and performance branch and has authority for promotions, advancements, and salary decisions.  CTA employees are divided into two categories: exempt or not exempt.  Exempt employees are not subject to the minimum wage and maximum hour requirements of the Fair Labor Standards Act, 29 U.S.C. §201, <u>et</u> <u>seq</u>.  All non-union employees are exempt and all exempt employees are non-union.  The CTA has approximately 1258 exempt employees.  Of the exempt employees, approximately 473 are African-American.

Plaintiffs are African-American CTA employees who are exempt employees or have sought promotion to the exempt ranks.  Allen and Burnette are senior personnel specialists in the human resources division.  Allen has worked for the CTA since March 1986 and Burnette since June 1987. Leonard is a duplicator operator III in the communications department.  Leonard has worked for the CTA since 1991.  Marshall is currently the professional programs coordinator within the training department and has worked for the CTA since 1989.  Newberry is a communications specialist in the management information systems department and has worked for the CTA since 1990.

## B    The CTA's promotion and pay procedures

Promotion opportunities into and within the exempt ranks and pay increases take place in various ways, none of which are used consistently. These methods are (1) posting a job and allowing employees to bid on it; (2) transferring or promoting a current employee; (3) hiring from outside the CTA; and (4) upgrading a current employee from one level to another. If a position is filled through any method other than posting, there is not a formal process for notifying and reviewing applicants or potential applicants for the position. Hiring managers within individual departments determine the decisionmaking process and decide whether or not to post vacant positions internally. Some departments post all positions, some decide whether to post on a case-by-case basis and others do not post positions at all. Under any of the methods, no one can be promoted or hired without the approval of the vice president of human resources (also called vice president of employee services division) and/or the general manager of personnel services. Once a candidate has been selected, the manager must explain in writing the reasons for the selection and submit all paperwork relating to the selection to the vice president of employee services. Similarly, all salary adjustments, pay increases and bonuses must be approved by the same individuals. Prior to January 1, 2000, Thomas Czech, who is white, was vice president of human resources and approved and signed off on all promotion, advancement and salary decisions. Prior to December 1999, Geraldine Tapling, who is white, was general manager for personnel services.

The CTA has an anti-discrimination and affirmative action program that applies to all branches, departments and divisions. It is official CTA policy that all terms and conditions of employment, including promotions and compensation, are administered without regard to race. The stated goal of the affirmative action plan is to reach the point where representation of minority group members are

commensurate with their availability in the relevant external labor market. These policies are posted on bulletin boards at all CTA locations and all position postings notify applicants of the policies. The human resources department is responsible for administration of the anti-discrimination and affirmative action policies.

## C    Allegations of racial discrimination and retaliation

### 1    Allen and Burnette

Allen and Burnette claim the CTA denied them promotion opportunities due to their race. It is traditional that openings for exempt positions within the CTA are posted so that existing employees can apply. Allen and Burnette assert the CTA failed to follow a consistent pattern or practice concerning the filling of available open positions in their department. They allege that in 1995, the position of manager of hourly employees was posted as available. Both Allen and Burnette were fully qualified for the position and applied for it. Tapling orally offered the position to Allen but then changed her decision and placed a male non-African-American in the position. They further allege the CTA improperly denied them the manager of salaried employees position in 1997. The manager of salaried employees retired in July 1997. Allen and Burnette were both qualified for the position and expressed interest in applying. However, they were repeatedly informed that the position was to be eliminated and would not be filled. On September 17, 1997, the CTA announced that Patrick Reilly, a white male, was promoted to manager of salaried employees. Reilly had less experience and was less qualified than either Allen or Burnette. Since September 1997, Allen and Burnette have qualified for other promotion opportunities but the CTA filled the positions with less qualified whites.

In September 1997, Allen and Burnette complained to the CTA's affirmative action unit claiming racial discrimination. They allege that the CTA's affirmative action unit found they had been

5

subjected to racial discrimination in promotions, but no action was taken. On October 24, 1997, Allen and Burnette filed discrimination charges with the IDHR and EEOC. They allege that after they initially complained about discrimination, both were harassed by unwarranted disciplinary actions. These actions included warnings and picayune complaints from their supervisors. Allen and Burnette allege they have been selectively disciplined while uncomplaining employees are not disciplined for the same conduct. On February 9, 1999, Allen filed an additional discrimination charge with the IDHR and the EEOC complaining of retaliation and received a right-to-sue letter. Burnette filed an additional discrimination charge with the IDHR and the EEOC complaining of retaliation on August 13, 1999, but has not yet received a right-to-sue letter concerning this charge.

### 2 Leonard

The CTA hired Leonard in 1991 as a bus driver. At the time he was hired, Leonard had worked in the printing industry for 25 years. In February 1993, Leonard transferred to the CTA's printshop, where he presently works. Leonard alleges that in September 1997, the position of manager of reprographics was posted and he applied. Leonard was not selected and the position was filled by Joseph Mitria, a non-African-American employee with no experience in printing. Within a year of Mitria's promotion, Leonard sought but was denied an upgrade to a grade 5 position within the print department. While the reason given for denying Leonard the upgrade was a lack of funds, he alleges that two white employees with less seniority were given upgrades. In late 1998, a coordinator position was posted for which Leonard asserts he was fully qualified. He applied for the position but was not selected. A non-African-American employee with less experience filled the position. In November 1998, another coordinator position was posted for which Leonard was qualified and he again applied.

Despite his qualifications, Leonard was not selected and the position was filled by a non-African-American from outside the CTA.

In August 1998, Leonard filed a complaint of racial discrimination with the CTA's affirmative action unit alleging he had been denied promotions and was harassed due to his race. As a result, Leonard was upgraded to a temporary grade 7 position. After he filed this complaint, Leonard alleges he has been subjected to a campaign of harassment, including a demotion, unwarranted disciplinary warnings and writeups, and interference with other promotion opportunities.

### 3 Marshall

The CTA hired Marshall in 1989 as a professional programs assistant. Marshall is currently a professional program coordinator. Marshall alleges that in late 1997 or early 1998, the CTA established a customer service division and the president of the CTA recommended him for the position of general manager, data research and business outreach. Marshall claims this promotion was vetoed by the vice president of human resources and the position was not filled. Marshall further alleges that in August 1998, the position of general manager of market development and special events became vacant. The CTA filled the position, without posting it, with a non-African-American who was not as qualified as Marshall. In February 1999, the CTA posted an opening for the position of manager of marketing and Marshall inquired about being promoted. According to Marshall, the position became open in August and he was the most qualified candidate, but the CTA decided not to fill the position rather than offer it to him.

### 4 Newberry

Newberry was hired by the CTA in 1990 as a senior program analyst. Newberry has a degree in data processing and computer sciences. Newberry claims that beginning in 1994, he was

consistently assigned to work outside his job description and was not permitted to perform the work

of a senior program analyst. Newberry claims he was denied opportunities for pay increases and has

been denied the opportunity for advancement and promotion as a result. Newberry further alleges he

was paid less than non-African-American senior program analysts in his department. In January 1998,

Newberry filed a complaint with the affirmative action unit alleging adverse treatment, including denial

of pay increases and promotions that were given to non-African-American analysts. On August 24,

1998, the affirmative action unit found "cause to support [Mr. Newberry's] allegation of race and

adverse treatment."

Newberry claims the CTA retaliated against him after he initially filed a complaint with its

affirmative action unit in January 1997. Newberry alleges that since filing the complaint, he has been

subjected to a campaign of harassment, including trumped-up disciplinary charges, constant

reassignments, pervasive monitoring and assignments of meaningless jobs outside his classification.

As a result of the stress, Newberry was forced to take a six month leave of absence. Newberry asserts

that upon his return, the CTA resumed its pervasive monitoring of his every move. He claims no other

employee was subjected to this type of surveillance.

### D    Class allegations

Plaintiffs allege the CTA has continuously discriminated against African-American employees

in awarding promotions. Plaintiffs claim because of this discrimination, the CTA has frequently

declined to award promotions to fully qualified African-American applicants and instead has promoted

less qualified non-African-Americans. Plaintiffs claim the CTA has implemented these discriminatory

promotion practices in some cases by posting job openings and then promoting non-African-Americans

in the place of African-American applicants who are equally or better qualified. In other cases, the

CTA has implemented it discriminatory promotion and salary practices by not posting job openings and by placing non-African-Americans in the non-posted positions without affording African-Americans the opportunity of applying. According to plaintiffs, the CTA has paid African-American employees at lower salaries than non-African-Americans at the same level and with comparable seniority. As a result of these practices, a disproportionately high number of African-Americans occupy lower paid jobs with less authority and responsibility, while a disproportionately high number of non-African-Americans occupy the higher paid jobs with more authority. Plaintiffs request that the policies and practices of the CTA be declared to be in violation of Title VII and §1983 and that the CTA be enjoined from engaging in discriminatory practices and be required to adopt employment practices and policies in accordance with Title VII and §1983. They also seek back pay, with interest, and attorneys' fees and litigation expenses.

## DISCUSSION

**I    Class action standard**

In order to maintain a class action, plaintiffs must satisfy the requirements of Federal Rule of Civil Procedure 23(a) and (b). Retired Chicago Police Ass'n v. City of Chicago, 7 F.3d 584, 596 (7th Cir. 1993). Rule 23(a) requires that (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). If these prerequisites are satisfied, the court must determine whether one of the standards of Rule 23(b) is met. Patrykus v. Gomilla, 121 F.R.D. 357, 360 (N.D. Ill. 1988). Plaintiffs seek certification under Rule

23(b)(2), which provides that a class action is proper if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2). The class determination generally involves both factual and legal issues, and may require a probing behind the pleadings to determine whether the interests of absent parties are fairly encompassed within the named parties' claims. Falcon, 457 U.S. at 160. However, in assessing the certification petition, the court does not examine the merits of the case. Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177 (1974 (court has no authority to examine merits while deciding class certification); Allen v. Isaac, 99 F.R.D. 45, 49 (N.D. Ill. 1983). Plaintiffs bear the burden of showing that certification is proper. Trotter v. Klincar, 748 F.2d 1177, 1184 (7th Cir. 1984). Failure to meet any one of the requirements of Rule 23 precludes certification of the class. Patterson v. General Motors Corp., 631 F.2d 476, 480 (7th Cir. 1980).

Plaintiffs seek to certify the following class:

> All African-Americans who have been employed by defendant Chicago Transit Authority at any time since December 29, 1996, and who are, were, or will be adversely affected by the CTA's continuing discriminatory policies and practices of denying equal promotional opportunities, equal pay, and equal terms and conditions of employment to African-Americans in and into the exempt ranks.

The CTA objects to the proposed class on multiple grounds. The CTA claims there are procedural barriers preventing the named plaintiffs from representing the proposed class. Specifically, it claims Leonard's and Newberry's Title VII claims are untimely and without merit. It also contends that neither Allen nor Burnette can represent the class on their Title VII claims because they did not include class-wide allegations in their EEOC charges. The CTA further claims that plaintiffs fail to establish

the proposed class meets the prerequisites for certification of Rule 23(a) and (b). The CTA's procedural arguments do not apply to all of plaintiffs' class claims. The CTA's procedural arguments only address problems with plaintiffs' Title VII claims. Regardless of the merits of these arguments, the court must still address whether the proposed class meets the requirement of Rule 23 in regards to plaintiffs' §1981 claims. *See* Memorandum Opinion and Order of July 24, 2000 (denying the CTA's motion to dismiss plaintiffs' §1981 claims). Accordingly, the court begins by addressing whether the purported class meets Rule 23 requirements.[1]

## II        Rule 23 requirements

### A        Numerosity

Rule 23(a) requires that the proposed class be so numerous that joinder of all members is impracticable. Plaintiffs claim they meet the numerosity requirement because the CTA has over 470 African-American exempt employees, not including former employees and non-exempt employees who wish to be promoted into the exempt ranks. The CTA claims plaintiffs fail to meet the numerosity requirement because they do not allege every African-American employee in the exempt ranks has sought and been denied a promotion on the basis of race. The CTA contends the fact there is a large number of African-American employees by itself is not sufficient evidence of numerosity. It concludes plaintiffs' numerosity argument is based on pure speculation and therefore must fail. The CTA relies on Cwiak v. Flint Ink Corp., 186 F.R.D. 494, 497 (N.D. Ill. 1999) in support of its numerosity argument. In Cwiak, plaintiff sought to certify a class of persons denied reimbursements for infertility treatments. Plaintiff presented statistics estimating that defendant had employed an estimated 200

---

[1]Because the court finds the CTA's Rule 23 arguments dispositive, it does not address the purported procedural flaws in the named plaintiffs' claims.

women who were infertile. Id. In denying certification, the court pointed out that plaintiff had presented no method to predict how many of the estimated infertile persons actually had incurred or would incur expenses relating to infertility. Because plaintiff provided no method to determine the number of potential members who would be actual class members, the court concluded that plaintiff's estimate was purely speculative and did not establish numerosity under Rule 23(a)(1). Id. The CTA claims the same reasoning applies here.

The CTA's argument has some merit. Plaintiffs only provide an estimate of the number of potential plaintiffs. They provide no method of determining how many of the 470 potential plaintiffs actually claim they were discriminated against on account of race. However, this uncertainty alone is insufficient to prevent certification of the class. While plaintiffs may not rely on conclusory allegations or speculation that joinder is impracticable, the complaint need not specify the exact number of persons included in the class. Allen v. City of Chicago, 828 F.Supp. 543, 550 (N.D. Ill. 1993). Plaintiffs must show some evidence of the number of class members; if plaintiffs cannot provide precise numbers, a good faith estimate is sufficient to satisfy the numerosity requirement. Id. quoting Long v. Thornton Township High. Sch. Dist. 205, 82 F.R.D. 186, 189 (N.D. Ill. 1979). Furthermore, the court is entitled to make common sense assumptions when determining the class is so numerous that joinder is impracticable. Buycks-Roberson v. Citibank Federal Savings Bank, 162 F.R.D. 322, 329 (N.D. Ill. 1995). In Cwiak, the court pointed to problems with plaintiffs' statistics leading to the estimate of 200 and pointed out the record revealed only nine identifiable class members. Cwiak, 186 F.R.D. at 497. Here, plaintiffs allege the CTA has over 470 African-American employees and that it has engaged in a pattern or practice of widespread discrimination. Plaintiffs further claim that discovery has revealed more than three dozen other CTA employees who have filed complaints

alleging discrimination. Based on plaintiffs' allegations, the class could contain many more members than that. This is sufficient. Classes of this size have been determined to meet the numerosity requirement. *See* <u>Marder v. Bank One Milwaukee</u>, 1995 WL 758413 (N.D. Ill. 1995) (forty class members is generally the benchmark rendering joinder impracticable). Accordingly, it appears that the purported class is so numerous that joinder is impracticable

## B  Commonality

Rule 23(a)(2) requires plaintiffs to demonstrate that there is at least one question of law of fact common to the class. <u>In re VMS Sec. Litig.</u>, 136 F.R.D. 466, 473 (N.D. Ill. 1991). Not all factual or legal questions must be common to all class members. Plaintiffs need only demonstrate that there is at least one issue of law or fact common to all class members. <u>Allen</u>, 828 F.Supp. at 551. Thus, class certification cannot be defeated solely because there are some factual variations among the claims of individual members. <u>Patterson</u>, 631 F.2d at 481. Where a question of law refers to standardized conduct by defendants toward members of the proposed class, a common nucleus of operative facts is typically presented and the commonality requirement is usually met. <u>Allen</u>, 828 F.Supp. at 551 (citing <u>Patrykus</u>, 121 F.R.D. at 361). Because racial discrimination is by definition class discrimination, class actions are particularly appropriate in cases dealing with allegations of racial discrimination. <u>Falcon</u>, 457 U.S. at 157. However, "it is settled law that a person of a given racial group may not represent other members of the group merely because they were all subjected to the same broad type of discrimination by a common employer." <u>Allen</u>, 828 F.Supp. at 551. In <u>Falcon</u>, the Supreme Court noted that "the mere fact that an aggrieved private plaintiff is a member of an identifiable class of persons of the same race or national origin is insufficient to establish his standing

to litigate on their behalf all possible claims of discrimination against a common employer." <u>Falcon</u>, 457 U.S. at 159 n. 15.

Plaintiffs fail to meet the commonality requirement. There are too many individual issues for there to be factual or legal issues common to the entire class. The purported class includes all exempt CTA employees, with hundreds of different jobs in dozens of different departments. Each promotion or pay decision would present a different set of facts for each employee. Plaintiffs have allegedly been denied different promotions and pay increases that require varying qualifications. Many supervisors have made the challenged decisions using different methods and criteria depending on the particular position and department. Even though all plaintiffs claim racial discrimination, "[t]he issue of whether a particular job assignment or promotion denial was discriminatory would depend upon any number of factors peculiar to the individuals competing for the vacancy, including relative seniority, qualification, availability for work and desire to perform the job." <u>Patterson</u>, 631 F.2d at 481. This is apparent from the named plaintiffs' varying allegations. For example, the decision not to promote Marshall to a general manager position was not made by the same person or on the same criteria as the decision to deny Leonard an exempt position in reprographics. "In other words, the plaintiff[s'] claims do not relate to general policies or practices which are allegedly discriminatory, but rather to individualized claims of discrimination which could not possible present common questions of law or fact sufficient to justify class action treatment." <u>Id.</u> Commonality is not met under these circumstances.

Courts have rejected certification in similar situations. In <u>Allen v. City of Chicago</u>, 828 F.Supp. 543, ten named plaintiffs sought to certify a class of "all Black and Hispanic City of Chicago employees who were laid off, discharged, demoted or were adversely affected as a result of the City's

reorganization of its work force . . ." Id. at 550.  The court determined that the facts alleged in the complaint described individualized claims of discrimination which did not present common questions of fact or law sufficient to justify class certification.  Id. at 552.  The court observed:

> Indeed, resolution of the merits of the instant dispute will require independent consideration of each plaintiff's qualification for his or her position, their previous work performance and duties, as well as the qualifications and work history of the white employees allegedly granted preferential treatment. Moreover, each of these considerations must be viewed in light of the employment conditions within each city department, which individually determined which employees would be affected by the reorganization.

Id.  The court concluded that in the absence of a discriminatory policy or practice of general application, such as a biased testing procedure, plaintiffs did not satisfy the commonality requirement. Id.

In Betts v. Sundstrand Corp., 1999 WL 436579 (N.D. Ill. 1999), twelve plaintiffs sought to certify a class of "all African-American persons who have unsuccessfully sought employment with defendant at its Rockford facility . . ." Id. at *1.  In rejecting the putative class, the court determined the fact that defendant's human resources personnel were partially responsible for the hiring process was not sufficient evidence of a centralized hiring process sufficient to establish commonality.  Id. at *6.  The court concluded "[t]he lack of a centralized hiring decision maker, the sheer number of managers who hire applicants, and the wide range of jobs included in the prospective class, indicate the lack of a common nucleus of operative fact between class members."  Id. at *7.  Similarly, in Gorence v. Eagle Food Centers, 1994 WL 445149 (N.D. Ill. 1994), the court refused to certify a class of "all present and future Eagle employees at the level of assistant store manager and above who were demoted, denied promotions or compensation . . . because of their age and/or sex."  Id. at *5.  The court recognized that whether defendant had discriminated against plaintiffs in refusing to promote

them would involve investigation into each individual's qualifications and work history. It stressed "[t]his is not a situation where a group of similarly situated individuals has been denied promotions to jobs requiring the same qualification and skills, at the same position or level, at the same time, by one set of decisionmakers." Id. Rather, "plaintiffs seek to represent all present and future Eagle employees at the level of assistant store manage and above." Id. Because there was no standardized conduct to examine, there was no common nucleus of operative facts and the court determined the class could not meet the commonality requirement. Id. This case is similar to Allen, Betts and Gorence. Because promotion and pay decisions are made in different ways by different people throughout the various departments of the CTA, there is no common nucleus of facts and plaintiffs cannot establish commonality.

Plaintiffs contend the common questions are: has the CTA discriminated against African-Americans in promotions, pay, and terms and conditions of employment? Plaintiffs contend that proof that an employer operates under a general policy of discrimination justifies a class of employees "if the discrimination manifested itself in hiring and promotion practices in the same general fashion such as through entirely subjective decision making processes." Falcon, 457 U.S. at 159 n. 15. Plaintiffs claim they have demonstrated that the CTA has a policy of standardless, highly discretionary decisionmaking that discriminates against African-Americans in promotion and salary. They asset their case will be proven by offering testimony and statistical evidence that will establish the CTA discriminates against African-Americans. In support of their argument, plaintiffs offer statistics of African-American under-representation and rely on cases where the court has certified classes based on employers' allegedly standardized conduct. See Orlowski, 172 F.R.D. 370 (certifying class of present and former female and Hispanic employees); Binion v. Metropolitan Pier and Exposition Auth., 163 F.R.D. 517 (N.D.

Ill. 1995) (certifying class of African-American employees); <u>Buycks-Roberson v. Citibank Federal Savings Bank</u>, 162 F.R.D. 322 (N.D. Ill. 1995) (certifying class of African-Americans and persons located in primarily African-American locations who were denied home loans due to a subjective decisionmaking process); <u>Meiresonne v. Marriott Corp.</u>, 124 F.R.D. 619 (N.D. Ill. 1989) (certifying class of female managers allegedly discriminated against due to a highly subjective decisionmaking process).

Plaintiffs' arguments are unpersuasive. Unlike the cases they cite, plaintiffs have failed to establish the CTA has a centralized or completely subjective decisionmaking policy. The record shows promotion and pay decisions are made at the level of individual departments by many different people using different methods with varying human resources involvement. The record does not support their claim that Czech was behind all promotions and decisions for all of the CTA's exempt employees in all departments. While Czech was involved in some departments' decisions, he had little to do with the personnel decisions in others. *See* Reply Mem. Ex. 17-20; Resp. Ex. A-G. Furthermore, there are dozens of departments and over 1200 exempt CTA employees. It is unclear how Czech could have exercised control over all personnel decisions on such a large scale. Similarly, the record does not reveal unfettered discretion in the CTA's decisionmakers. The CTA has a written anti-discrimination and affirmative action policy. Managers are required to put the reasons for their decisions in writing. At most, the record shows that Czech and human resources shared responsibility for promotion and pay decisions with the individual department managers. This is not sufficient to establish a centralized or entirely subjective practice. *See* <u>Betts</u>, 1999 WL 436579 at *6-7.

Plaintiffs are correct in asserting that a class action may be appropriate where a plaintiff's disparate impact claim is based on an employer's entirely subjective decisionmaking practices. <u>Falcon</u>,

457 U.S. at 159. Courts have certified class actions based on anecdotal evidence of discrimination in combination with statistical evidence of minority under-representation. Buycks-Roberson, 162 F.R.D. 322; Meiresonne, 124 F.R.D. 619. However, plaintiffs' case is more like Betts and Gorence than Buycks-Roberson or Meiresonne. Plaintiffs' across-the-board allegations of disparate impact and their proffered statistics do not overcome the essentially individualized nature of the claims they assert. In essence, plaintiffs' claims are too individualized to meet the commonality requirement.

## C    Typicality

In order to certify a class, plaintiffs must also show their claims are typical of the claims of the class. Fed. R. Civ. P. 23(a)(3). Typicality is closely related to the commonality requirement and both considerations sometimes tend to merge. Falcon, 457 U.S. at 158 n. 13 (1982). While numerosity and commonality focus on the characteristics of the class, typicality and adequacy of representation focus on the characteristics of the class representatives relative to the class. Hill v. Gateway 2000, Inc., 1996 WL 650631, *4 (N.D. Ill. 1996) (citing 1 H. Newberg, Newberg on Class Actions, § 3.13 at 163 (1985)). "A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." De La Fuente v. Stokely-Van Camp. Inc., 713 F.2d 225, 232 (7th Cir. 1983). While factual differences between claims do not preclude certification, the representatives' claims must arise from the same event or course of conduct that gives rise to the claims of other class members and must be based on the same legal theory. Id.   To meet the typicality requirement, the named representatives must establish the bulk of the elements of each class member's claims when they prove their own claims. Allen, 828 F.Supp. at 552. "If the named plaintiffs' claims are too individualized,

such that they do not arise from the same event, practice or course of conduct that gives rise to the claims of the other class member, typicality will not be found." <u>Gorence</u>, 1994 WL 445149 at *10.

For many of the same reasons plaintiffs fail to establish commonality, plaintiffs also fail to meet the typicality requirement. The CTA fills positions, promotes employees and makes pay decisions using different methods in its various departments. Due to the individualized nature of each claim, if a named plaintiff can ultimately prove that the CTA discriminated against him or her, the plaintiff will not have established the elements of any other class member's claims. If Allen and Burnette establish that they were more qualified than the non-African-American candidate selected and were denied a manager's position in the human resources department due to their race, this showing would not entitle any other plaintiff to relief. Similarly, if Marshall establishes that Czech vetoed a possible promotion to general manager of data research and business outreach on account of his race, this does not help Leonard, or any other class member, show he was denied an exempt position in reprographics due to discrimination. Each plaintiff will prevail only upon an individualized showing of racial discrimination. As discussed above, "each plaintiff's work history and qualifications must be compared with the qualifications and work history of the workers in his or her department who were allegedly granted preferential treatment, in order to determine whether discrimination occurred. This entails the adjudication of individual fact-specific claims." <u>Gorence</u>, 1994 WL 445149 at *10. Furthermore, although plaintiffs argue Czech was personally responsible for all CTA discrimination, only Marshall alleges Czech was actually involved in the decisions to deny his promotion opportunities. As in <u>Allen</u>, "the lack of repercussion from claim to claim" derives from the diverse nature of the employment actions in controversy. <u>Allen</u>, 828 F.Supp. at 553. In sum, the claims of the named plaintiffs are

simply too personal to be typical; they do not have the same essential characteristics as the claims of the entire class.

## D    Adequacy of representation

Rule 23(a)(4) requires that the named plaintiffs adequately and fairly represent the interests of the class as a whole. This determination has two elements: (1) the adequacy of the named plaintiffs' counsel; and, (2) the adequacy of representation provided in protecting the different, separate and distinct interests of class members. Retired Chicago Police Ass'n, 7 F.3d at 598. "A class is not fairly and adequately represented if class members have antagonistic or conflicting interests." Secretary of Labor v. Fitzsimmons, 805 F.2d 682, 697 (7th Cir. 1986). The presence of even an arguable defense against the named plaintiffs that is not applicable to the proposed class, can vitiate the adequacy of named plaintiffs' representation. Buycks-Roberson v. Citibank Federal Savings Bank, 162 F.R.D. 322, 334 (N.D. Ill. 1995).

The CTA does not contest the adequacy of plaintiffs' counsel and the court finds no reason to do so. Plaintiffs have experienced and able counsel. The CTA contests the adequacy of the named plaintiffs. It contends the named plaintiffs are individually inadequate and that there are conflicts within the purported class. Specifically, the CTA claims that neither Newberry nor Leonard can assert viable failure to promote claims individually, and as a result cannot be class representatives. The CTA further contends some plaintiffs have conflicting claims because members of the purported class competed with each other for promotions and some class members are actually responsible for the decisions that are at issue. Plaintiffs claim none of these reasons warrant denial of certification.

The CTA's arguments regarding the strength of the plaintiffs' individual claims is without merit. In Robinson v. Sheriff of Cook County, 167 F.3d 1155, 1158 (7th Cir. 1999), the Seventh

Circuit acknowledged that if a named representative's claim is a "*clear* loser at the time asks to be made class representative" the weakness of his claim can be a reason to deny certification. This is not the case here. None of the named plaintiffs' claims are clearly without merit. In its brief in opposition to class certification, the CTA references motions for summary judgment filed regarding Newberry's and Leonard's claims. However, an examination into the merits of the case is not permitted on the issue of class certification. *See* <u>Eisen</u>, 417 U.S. at 177.

The CTA's assertion of conflicts within the proposed class is more persuasive. There are two major problems with the proposed class. First, class members competed against each other for some of the denied promotions. For example, it is apparent that Allen and Burnette competed for the same positions in the human resources department. Similarly, other African-Americans applied for promotions sought by Leonard. Considering that plaintiffs' purported class contains all exempt workers in all CTA departments, it is likely there are many situations where class members applied for the same promotions. This conflict between class members counsels against certification. *See* <u>Allen</u>, 828 F.Supp. at 553 (named plaintiffs were not adequate representatives where "the expansive class definition makes it likely that members of the putative class may have competed with one or more of the representative parties for a single position or promotion"). Furthermore, some purported class members are responsible for decisions not to promote other class members. The interests of the class members who are responsible for some of the challenged decisions conflict with the interests of class members who are challenging those decisions. *See* <u>Retired Chicago Police Ass'n</u>, 7 F.3d at 598 (named plaintiffs were not adequate representatives where putative class member made the challenged decisions). For example, it appears that Burnette actually participated in the decision to deny Leonard's third promotion. Considering that the proposed class includes exempt employees from all

departments at all levels, it is likely there are many instances where class members were partially responsible for decisions challenged by other class members. In light of these conflicts, the named plaintiffs are not adequate representatives of the proposed class.

Plaintiffs' arguments otherwise are unpersuasive. Plaintiffs rely on Meiresonne v. Marriott Corp., 124 F.R.D. 619, 625 (N.D. Ill. 1989) to counter the CTA's argument regarding competition for the same position by class members. In Meiresonne, the court rejected the argument that the named plaintiffs could not adequately represent the class because class members may have competed with each other for promotions. Id. However, the danger of conflict is greater here than in Meiresonne. Here, two of the five named plaintiffs twice applied for the same position. These are the only two promotions Allen and Burnette specifically identify they were denied. Moreover, this court relied on this argument in a similar situation in Allen, which was decided four years after Meiresonne. 828 F.Supp. at 553.

The court concludes the conflicts between class members prevent the named plaintiffs from adequately representing the interests of the entire class. Thus, plaintiffs fail to meet the requirements of Rule 23(a)(4). Because the court has determined that plaintiffs have failed to meet the requirements of Rule 23(a), it need not address the requirements of Rule 23(b).

**CONCLUSION**

The motion for class certification is denied.

ENTER:

Suzanne B. Conlon
United States District Judge

July 28, 2000