# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Suzanne B. Conlon | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 7614 | **DATE** | 8/4/2000 |
| **CASE TITLE** | ANNETTE ALLEN, et al. vs. CHICAGO TRANSIT AUTHORITY | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry]  The motions for summary judgment [59-1; 64-1] are granted. Judgment is entered in favor of defendant Chicago Transit Authority and against plaintiff Earnest Leonard on Leonard's Title VII discrimination claim (Count I). Judgment is entered in favor of defendant Chicago Transit Authority and against plaintiff Rahpre Newberry on Newberry's Title VII discrimination claim (Count I) and Title VII retaliation claim (Count V). ENTER MEMORANDUM OPINION AND ORDER.

/s/ Suzanne B. Conlon

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | Document Number |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | AUG 10 2000 date docketed | 127 |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | ED-7 FILED FOR DOCKETING | 8/4/2000 date mailed notice | |
| | Copy to judge/magistrate judge. | 00 AUG -9 PM 5: 19 | | |
| WS | courtroom deputy's initials | Date/time received in central Clerk's Office | JAD mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ANNETTE ALLEN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | No. 99 C 7614 |
| | ) | |
| v. | ) | Suzanne B. Conlon, Judge |
| | ) | |
| CHICAGO TRANSIT AUTHORITY, | ) | |
| | ) | |
| Defendant. | ) | |

DOCKETED
AUG 1 0 2000

## MEMORANDUM OPINION AND ORDER

In their second amended complaint, plaintiffs Annette Allen ("Allen"), Shelley Burnette ("Burnette"), Earnest Leonard ("Leonard"), Brian Marshall ("Marshall"), and Rahpre Newberry ("Newberry") sue the Chicago Transit Authority ("CTA") for employment discrimination in violation of Title VII (Count I) and 42 U.S.C. § 1981 (Count II). Allen, Burnette, Leonard, and Newberry also sue the CTA for retaliation under Title VII and § 1981 (Counts III-V). On July 24, 2000, the court dismissed plaintiffs' § 1981 retaliation claims without prejudice. On July 28, 2000, the court denied plaintiffs' motion for class certification. In separate motions, the CTA now moves for summary judgment on Leonard and Newberry's Title VII discrimination claims (Count I) and on Newberry's Title VII retaliation claim (Count V) pursuant to Fed. R. Civ. P. 56.

## DISCUSSION

### I. PROPRIETY OF SUMMARY JUDGMENT AT THIS STAGE

On May 15 and 16, 2000, the CTA filed the present summary judgments motions, which were based on the first amended complaint. On May 31, 2000, the court granted plaintiffs leave to file a second amended complaint. On June 1, 2000, the court granted plaintiffs two months to respond to

the motions for summary judgment,[1] setting July 14 as the response date. That same day, the court set September 25, 2000 as the date for close of discovery and submission of dispositive motions. Plaintiffs timely responded to the summary judgment motions. However, their response virtually ignores the CTA's arguments on the merits. The response also fails to comply with Local Rule 56.1 for the Northen District of Illinois. Instead, the thrust of plaintiffs' response is that the CTA's summary judgment motions are premature for various reasons. The court disagrees.

A.  **Additional Discovery**

Plaintiffs first argue the court should not yet entertain summary judgment because discovery does not close until September 25, 2000. However, a party may move for summary judgment "at any time." Fed. R. Civ. P. 56. Plaintiffs respond that they have not yet had the opportunity to conduct discovery on matters relevant to opposing summary judgment in this eight month old case. The court is not persuaded. Plaintiffs have had over two months since the CTA moved for summary judgment in which to conduct relevant discovery and depose CTA's witnesses. Plaintiffs do not appear to have deposed any CTA employees whose testimony could be relevant to Leonard and Newberry's claims. In fact, plaintiffs state they still "wish" to depose key CTA decisionmakers, but apparently have made no effort to do so.

Plaintiffs do not explain why this discovery has not yet occurred. Plaintiffs did request leave to conduct additional discovery in their response. But they did not timely file an affidavit pursuant to Fed. R. Civ. P. 56(f) explaining their failure to conduct discovery or their inability to respond to

---

[1] Normally, the court sets a 20 day response date for summary judgment motions.

summary judgment.[2] It was not until after the CTA filed its summary judgment reply pointing out that plaintiffs failed to attach a Rule 56(f) affidavit that plaintiffs moved to file the Rule 56(f) affidavit of John Bellcaster, one of their attorneys. Plaintiffs claim the failure to attach the affidavit to their response was inadvertent. However, the circumstances surrounding the affidavit suggest the contrary. The Bellcaster affidavit is not cited in plaintiffs' response. Moreover, the affidavit is undated and does not appear to have been in existence at the time plaintiffs responded. The failure to date the affidavit suggests it was prepared as a sur-reply to the CTA's reply.

But even if plaintiffs had timely submitted the Bellcaster affidavit, the affidavit is insufficient because it does not state reasons warranting postponement of summary judgment. "'A party who has been dilatory in discovery may not use Rule 56(f) to gain a continuance where he has only made vague assertions that further discovery would develop genuine issues of material fact.'" Colby v. J.C. Penny Co., Inc., 926 F.2d 645, 649 (7th Cir. 1991) (quoting United States v. Bob Stofer Oldsmobile-Cadillac, Inc., 766 F.2d 1147, 1153 (7th Cir. 1985)). The affidavit identifies two areas of discovery believed to be particularly relevant. First, plaintiffs wish to complete discovery of the CTA's hiring and promotion data in order to "to complete the statistical analysis of the disparate treatment accorded the CTA's African-American employees, across the putative class." Bellcaster Aff. ¶ 7. Plaintiffs argue the CTA has been dilatory in providing computer data necessary to complete this analysis. However, the record does not substantiate this accusation. Moreover, class certification has been denied and Leonard and

---

[2] Rule 56(f) provides:

> Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

3

Newberry assert only disparate treatment claims. "[S]tatistics are improper vehicles to prove discrimination in disparate treatment (as opposed to disparate impact) cases." Plair v. E.J. Brach & Sons, Inc., 105 F.3d 343, 349 (7th Cir. 1997); see also Gilty v. Village of Oak Park, 919 F.2d 1247, 1253 n. 8 (7th Cir. 1990) ("[s]tanding virtually alone, as they are in this case, statistics cannot establish a case of individual disparate treatment") (citations omitted). Plaintiffs fail to show how the statistical data will be relevant to Leonard and Newberry's adverse treatment claims, and (as will be shown) Leonard and Newberry adduce scant evidence aside from statistics to support those claims. Plaintiffs also assert they wish to depose key CTA decisionmakers and the CTA's witnesses. They assert additional computer discovery will permit them to identify additional deponents. This may be true, but the key decisionmakers relevant to Leonard and Newberry's claims have been known to plaintiffs for some time. Indeed, in their deposition testimony Leonard and Newberry identified numerous CTA employees who allegedly discriminated against them. The court is not convinced that plaintiffs have been diligent in conducting discovery or that additional discovery will yield evidence pertinent to the present summary judgment motions.

## B.     Overlap with § 1981 Claims

Plaintiffs seek to delay resolution of summary judgment on the ground that the CTA's motions are piecemeal. Plaintiffs note that the facts relevant to Leonard and Newberry's Title VII claims (the subjects of the present motions) are, by and large, the same facts relevant to Leonard and Newberry's § 1981 claims. Plaintiffs conclude that entertaining summary judgment will not conserve judicial resources because trial will proceed in the same manner regardless of the disposition of Leonard and Newberry's Title VII claims. However, plaintiffs's belief that Leonard and Newberry's § 1981 claims

will go to trial is purely speculative. It does not justify postponing resolution of the present motions, which may further judicial economy by narrowing issues.

C.  **Partial Summary Judgment**

Finally, plaintiffs assert summary judgment should not be used to decide parts of claims. Relying upon cases like Arado v. General Fire Extinguisher Corp., 626 F. Supp. 506 (N.D. Ill. 1986) and Capitol Records, Inc. v. Progress Record Distrib., Inc., 106 F.R.D. 25, 29 (N.D. Ill. 1985), plaintiffs contend the CTA seeks the "piecemealing of a single claim" and "issue-narrowing" that is improper on summary judgment. Arado, 626 F. Supp. at 509. However, this is not a case where a defendant seeks partial summary judgment on only a portion of a claim or an issue comprising a larger claim. Compare Taylor v. Bekins Van Lines, 1996 WL 14004, at *5 (N.D. Ill. Jan. 12, 1996) (Conlon, J.) (where defendant moved for summary judgment on breach of contract claim, court refused to entertain plaintiff's motion for partial summary judgment on sub-issue of whether contract existed). Leonard and Newberry assert discrimination claims under Title VII (Count I), discrimination claims under § 1981 (Count II), and retaliation claims under Title VII (Counts IV & V). The CTA seeks summary judgment on Leonard's and Newberry's Title VII discrimination claims and Newberry's retaliation claim; granting the CTA's motion would wholly dispose of these claims and is entirely permissible. See Arado, 626 F. Supp. at 509-11 (declining to grant partial summary judgment on the sub-issue of damages on plaintiff's ADEA claim, but granting summary judgment against plaintiff on plaintiff's remaining claims).

D.  **Local Rule 56.1 Compliance**

Because plaintiffs fail to establish good cause for delaying summary judgment, the court will address the merits. However, plaintiffs' failure to file responses in conformance with Local Rule 56.1

of the Northern District of Illinois affects the way in which the court does so. Local Rule 56.1 requires litigants to follow detailed procedures in filing and responding to summary judgment motions. Local Rule 56.1(a)(3) requires the moving party to file a statement of undisputed material facts entitling it to judgment as a matter of law. Rule 56.1(b)(3)(A) requires a party opposing summary judgment to provide "a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." Leonard and Newberry did not file Rule 56.1(b)(3)(A) responses. This failure results in the binding admission of the truth of the CTA's Rule 56.1(a)(3) factual statements. Local Rule 56.1(b)(3)(A); Giannopoulos v. Brach, 109 F.3d 406, 411 (7th Cir. 1997). Although this admission does not inevitably require granting summary judgment against plaintiffs, it severely penalizes them by requiring the court to "depart from [its] usual posture of construing all facts in favor of the non-moving party." Johnson v. Gudmundsson, 35 F.3d 1104, 1108 (7th Cir. 1994). Instead, the court will not consider any facts contradicting the CTA's Rule 56.1(a)(3) statements. Smith v. Severn, 129 F.3d 419, 425-26 (7th Cir. 1997). However, the court must still view facts in the Rule 56.1(a)(3) statement and all reasonable inferences in the light most favorable to plaintiffs. Id.

## II. STANDARDS

A movant is entitled to summary judgment under Rule 56 when the moving papers and affidavits show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Unterreiner v. Volkswagen of America, Inc., 8 F.3d 1206, 1209 (7th Cir. 1993). Once a moving party has met its burden, the non-moving party must go beyond the pleadings and set forth specific facts showing

there is a genuine issue for trial. Fed. R. Civ. P. 56(e); Becker v. Tenenbaum-Hill Assoc., Inc., 914 F.2d 107, 110 (7th Cir. 1990). The court considers the record as a whole and draws all reasonable inferences in the light most favorable to the party opposing the motion. Fisher v. Transco Services-Milwaukee, Inc., 979 F.2d 1239, 1242 (7th Cir. 1992).

A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Stewart v. McGinnis, 5 F.3d 1031, 1033 (7th Cir. 1993). This standard is applied with added rigor in employment discrimination cases, where issues of intent and credibility often dominate. Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035, 1038 (7th Cir. 1993) (citations omitted). Although this language could be misconstrued to require heightened review in employment cases, the Seventh Circuit has stressed that "there is no separate rule of civil procedure in employment discrimination cases;" rather, the "added rigor" language means only that "courts should be careful in a discrimination case as in any case not to grant summary judgment if there is an issue of material fact that is genuinely contestable, which an issue of intent often though not always will be." Wallace v. SMC Pneumatics, Inc., 103 F.3d 1394, 1396 (7th Cir. 1997). Employment discrimination case or not, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

## III. LEONARD'S CLAIMS

In Count I, Leonard argues the CTA violated Title VII by failing to promote him based on his race. Leonard contends he was denied promotions on three occasions: (1) in September 1997 when he applied to be manager of reprographics; (2) in early 1998 when he applied for a finishing specialist position; and (3) in fall 1999 when he applied for a reproduction coordinator position. Second Amend.

7

Compl. ¶¶ 33-35; Leonard Dep. at 94; 320; CTA's Statement of Facts in support of Motion for Summary Judgment on Leonard's Title VII Discrimination Claims, Ex. 20.

A.  **Procedurally Barred Claims**

A Title VII plaintiff must file an EEOC charge of discrimination within 300 days of the date when he knew or should have known of facts supporting a claim of discrimination; failure to do so renders the charge untimely. 42 U.S.C. § 2000e-5(e); Filipovic v. K&R Express Systems, Inc., 176 F.3d 390, 396 (7th Cir. 1999); Doe v. R.R. Donnelly & Sons, Co., 42 F.3d 439, 445 (7th Cir. 1994). Joseph Mitria ("Mitria") was hired for the reprographics manager position in September 1997. It is not clear whether Leonard believed at that time his rejection for this position was discriminatory. However, Leonard testified that he believed his rejection for the finishing specialist position was discriminatory at the time of his rejection in March 1998. Leonard Dep. at 367-68. Leonard testified that at that time, he believed Mitria (who was responsible for filling the finishing specialist position) was behind the discrimination and that "[i]t start[ed] forming a pattern to me." Id. at 367. Therefore, Leonard believed at least as early as March 1998 that his rejections were discriminatory. However, Leonard did not file an EEOC charge alleging discriminatory failure to promote until January 2000, more than 300 days after March 1998. Accordingly, Leonard may not support his Title VII discrimination claim with evidence of promotion denials in September 1997 and early 1998.[3]

---

[3] Leonard may not establish the timeliness of his Title VII claims by "piggybacking" on the October 1997 EEOC charges of Allen and Burnette. Allen and Burnette's 1997 charges did not contain class allegations. See January 27, 2000 Memorandum Opinion and Order; Anderson v. Montgomery Ward & Co., 852 F.2d 1008, 1016 (7th Cir. 1988) (in order for plaintiff to piggyback on earlier EEOC charge filed by co-plaintiff, the earlier charge "must, at the very least, contain an allegation of class-wide discrimination").

Leonard briefly asserts he may rely on the continuing violation doctrine to sue upon the September 1997 and early 1998 promotion denials. Under the continuing violation doctrine, courts will treat time-barred acts of discrimination as part of a single, continuous act ending within the discrimination period. Filipovic, 176 F.3d at 396; Selan v. Kiley, 969 F.2d 560, 564 (7th Cir. 1992). In deciding whether to apply the doctrine, courts consider: (1) whether the acts involve the same subject matter; (2) the frequency of the acts; and (3) the degree of permanence of the alleged acts of discrimination, "which should trigger an employee's awareness of and duty to assert his or her rights." Filipovic, 176 F.3d at 396 (quoting Selan 969 F.2d at 565). "The continuing violation doctrine is applicable only if 'it would have been unreasonable to expect the plaintiff to sue before the statute ran on the conduct, as in a case in which the conduct could constitute, or be recognized, as actionable harassment only in the light of events that occurred later, within the period of the statute of limitations.'" Filipovic, 176 F.3d at 396 (quoting Galloway v. General Motors Serv. Parts Operations, 78 F.3d 1164, 1167 (7th Cir. 1996)). While Leonard's rejection for the reproduction coordinator position he applied for in the fall of 1999 may have reinforced his belief of discrimination, Leonard believed he was being discriminated against at least as early as March 1998. Accordingly, the continuing violation doctrine is inapplicable.

## B. The Remaining Promotion Denial

Leonard's rejection for the reproduction coordinator position in the fall of 1999 is the only timely act of purported failure to promote. Because Leonard does not offer direct evidence of discrimination, he must use indirect evidence to establish a *prima facie* case of discrimination. To demonstrate a *prima facie* case, Leonard must show: (1) he is a member of a protected group; (2) he applied for and was qualified for the position; (3) he was rejected for the position; and (4) those who

were promoted had similar or lesser qualifications for the position, or other evidence from which one can infer that Leonard was denied promotion for a discriminatory reason. Pafford v. Herman, 148 F.3d 658, 669 (7th Cir. 1998); Brill v. Lante Corp., 119 F.3d 1266, 1270 (7th Cir. 1997). If he establishes a *prima facie* case, the burden shifts to the CTA to articulate a non-discriminatory reason for the rejection. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973); Dunning v. Simmons Airlines, Inc., 62 F.3d 863, 869 (7th Cir. 1995). If the CTA articulates a non-discriminatory reason, the burden shifts back to Leonard to show the proffered reason could be a pretext for discrimination. Brill, 119 F.3d at 1270. Leonard may establish pretext by showing the CTA's reason is unworthy of credence or that the decision was more likely than not motivated by discriminatory reasons. Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981); DeLuca v. Winer Indus., Inc., 53 F.3d 793, 797 (7th Cir. 1995). The ultimate burden of persuasion remains at all times with Leonard. See St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993).

Leonard does not identify facts supporting a reasonable inference that his rejection for the reproduction coordinator position was discriminatory. To the contrary, evidence shows that the four supervisors who interviewed him for the position (Mitria, Awilda Zanin ("Zanin"), Robert Caswick ("Caswick"), and his co-plaintiff Burnette) did not regard him as qualified. Mitria, Zanin, and Caswick each rated Leonard as "not recommended." CTA Reply Ex. M, N, O.[4] Mitria noted that despite Leonard's claims of extensive knowledge in the field, Leonard could not answer questions and that his responses demonstrated a lack of knowledge and skill for the job. Id. Ex. M. Zanin noted Leonard failed to answer questions about the position and did not sufficiently describe his background related

---

[4] Some pages from these evidentiary materials, while cited in the CTA's motion for summary judgment and its Local Rule 56.1 statement, were not submitted to the court. The CTA provided the missing pages as exhibits to its reply. Therefore, the court cites to the reply.

to the position. Id. Ex. N. Caswick noted Leonard was "very evasive on answers and skipped around [the] subject." Id. Ex. O. Most telling, Burnette, Leonard's co-plaintiff, rated Leonard "marginal[ly] recommended" and noted Leonard "did not demonstrate the exp[erience] needed for this position." Id. Ex. L. Moreover, Burnette testified that the employee hired for the position, Cipriano Lozoya ("Lozoya"), was more qualified than Leonard. Burnette Dep. at 521-22, 530.

Relying on documents submitted after the CTA submitted its reply, Leonard argues that Caswick and Zanin did not regard Lozoya as qualified because they wrote in their evaluations that Lozoya "never did quality work," and because that Caswick appears to have initially rated Lozoya as "not suitable" in each of three core review categories. Plaintiffs' Resp. Ex. X. Plaintiffs point to Lozoya's declaration that based on his experience with Leonard, he believes Leonard is as qualified as he was for the reprographics coordinator position. Id. Ex. O. However, to survive summary judgment, Leonard must show the reasons given for his rejection are pretextual – that his interviewers did not honestly believe he was unqualified. "The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered," and the court does not "sit as a superpersonnel department that reexamines an entity's business decision and reviews the propriety of the decision." Stewart v. Henderson, 207 F.3d 374, 378 (7th Cir. 2000) (citations omitted).

Mitria, Burnette, and Zanin noted, in contrast to Leonard's answers, that Lozoya's answers to questions were "good" and "very acceptable." Id. Ex. X. Lozoya's responses evinced the capacity to perform the requirements of the position while Leonard's did not. Leonard does not show the interviewers believed the contrary. The most that can be said from Leonard's evidence is that it may have been a bad business decision to award the promotion to Lozoya because although he

11

demonstrated the ability to do the job, his past performance was deficient. But this does not evince discriminatory motive. Accordingly, summary judgment must be granted against Leonard on his failure to promote claims brought under Title VII (Count I).

## IV. NEWBERRY'S TITLE VII CLAIMS

Newberry raises two Title VII claims against the City: that he was discriminatorily denied promotions and paid less than non-African-Americans holding the same job (Count I) and that he was retaliated against for complaining of discrimination (Count II).[5] In 1990, Newberry was hired as a program analyst in the mainframe area of the CTA's management information system ("MIS") department. That same year, he was promoted to senior program analyst. In 1992, after experiencing friction with coworkers, Newberry was moved from the mainframe area to the PC/LAN area. Newberry contends this change forced him to do tasks outside his job description and prevented him from maintaining and improving certain computer skills to further his career. Newberry believed at the time that this change was discriminatory. On many occasions between 1992 and 1997, Newberry was shifted between various supervisors in the PC/LAN area. In January 1998, Newberry filed a complaint with the CTA's affirmative action unit, claiming the reassignments and job duties outside his job description were discriminatory. In August 1998, the affirmative action unit found cause for his complaint.

---

[5] Despite Newberry's protestation that Count V is a claim for "harassment" as opposed to retaliation (and despite the fact that Count V is entitled "Unlawful harassment"), Count V is in substance a retaliation claim. Count V complains of "trumped-up" disciplinary charges, reassignments, and constant monitoring following Newberry's internal complaint of discrimination. These are classic instances of retaliation. Moreover, Count V's prayer for relief requests damages caused by "the retaliation by the CTA" and seeks an injunction "enjoining the CTA from engaging in the retaliatory practices complained of herein."

On September 10, 1998, Newberry filed an EEOC charge claiming he was denied promotions in favor of less-qualified non-African-Americans based on his race, that he was required to perform duties outside his job description, and that he had been assigned to different supervisors during the work week. The charge stated Newberry's address was on South Michigan Avenue in Chicago. On December 11, 1998, the EEOC issued a right-to-sue notice and sent the letter to the South Michigan address provided in the charge. Although the letter contained an incorrect zip code, the post office delivered the letter to the South Michigan address on December 19, 1998. Newberry did not receive the letter because he had moved in November 1998. On January 25, 2000, Newberry filed an amended EEOC charge. The charge reiterated Newberry's claim that he had been discriminatorily denied promotions. The charge alleged for the first time that he received less pay than non-African-Americans holding the same job title. The charge also included class allegations.

A.     **Procedural Bars**

The CTA first argues Newberry may not base his Title VII claims on allegations raised in the September 1998 EEOC charge because he did not file suit within 90 days of the December 1998 right-to-sue letter. Suit must be filed within 90 days of receiving a right-to-sue notice. 42 U.S.C. § 2000e-5(f)(1). The CTA contends the EEOC sent the right-to-sue letter to the last known address provided by Newberry to the EEOC, and that Newberry is at fault for not having received it. Relying upon St. Louis v. Alverno College, 744 F.2d 1314, 1317 (7th Cir. 1984), the CTA argues the 90-day clock began ticking upon delivery of the letter to the South Michigan address even though Newberry no longer lived at that address. Alverno College explained that despite the requirement that claimants with pending EEOC charges notify the EEOC of a change of address, "claimants who do not receive actual knowledge of their right-to-sue letter through no fault of their own should not be penalized."

13

Id. The court held that where the plaintiff failed to notify the EEOC that he had moved or had otherwise taken reasonable steps to ensure he would receive mail delivered to his prior address, "the ninety-day limit began running on the date the notice was delivered to the most recent address plaintiff provided to the EEOC." Id. Drawing all reasonable inferences in Newberry's favor, evidence shows that in November 1998, Newberry notified the EEOC of his new address and filed a forwarding order with the post office directing mail addressed to his South Michigan address to be sent to his new address. Plaintiffs' Resp. Ex. E & F. Apparently, the post office failed to forward the letter because it contained an incorrect zip code. Newberry's efforts constitute reasonable precautions to ensure receipt of correspondence from the EEOC. See Jones v. Michael Reese Hosp., 1991 WL 105583, at *2-3 (N.D. Ill. June 7, 1991) (Conlon, J.).

Moreover, the EEOC timely rescinded the right-to-sue letter and reopened its investigation of Newberry's September 1998 charge. 29 C.F.R. § 1601.12(b)(1) provides that when the EEOC decides to reconsider a dismissal, it can vacate the dismissal and rescind the right-to-sue letter if it issues notice within 90 days of the claimant's *receipt* of the right-to-sue letter.[6] It was not until calling the EEOC on March 24, 1999 (after making numerous inquiries during the preceding months about the status of his September 1998 charge) that Newberry learned of the right-to-sue letter. Plaintiffs'

---

[6] The CTA argues the EEOC could not rescind the right-to-sue notice because it failed to do so within 90 days of the *issuance* of the notice. The CTA cites Dougherty v. Barry, 869 F.2d 605 (D.C. Cir. 1989). Dougherty held "[EEOC] reconsideration reopens the door to a private action only when the reconsideration itself occurs withing ninety days of the issuance of a right to sue notice." Id. at 610. Dougherty's use of the word "issuance" is nothing more than overly broad *dicta*. There was no need to distinguish between issuance and receipt of the right to sue letter because the reconsideration notice in that case issued more than 90 days after both the issuance and receipt of the right to sue notice. Moreover, Dougherty cites § 1601.21(b)(1) which, as discussed, permits revocation of the right to sue notice if the notice of reconsideration is issued within 90 days of "receipt" of the right-to-sue notice. Dougherty's use of the word "issuance" directly conflicts with the regulation's use of the word "receipt."

Resp. Ex. E, G. The EEOC rescinded the right-to-sue notice and reopened its investigation on May 12, 1999, less than 90 days following Newberry's actual notice of his right-to-sue.

Finally, the acts of discrimination alleged in Newberry's January 2000 amended charge relate back to the September 1998 charge. While "an untimely amendment that alleges an entirely new theory of recovery does not relate back to a timely filed original charge . . . amendments alleging additional acts which constitute unlawful employment practices related to or growing out of the subject matter of the original charge will relate back to the date the charge was first received." Fairchild v. Forma Scientific, Inc., 147 F.3d 567, 574-75 (7th Cir. 1998). Both the September 1998 charge and the January 2000 charge alleged the same theory of recovery: racial discrimination. The September 1998 charge alleged racially discriminatory denial of promotions and job reassignments; the January 2000 charge alleged Newberry was paid less than non-African-Americans holding the same job. The January 2000 charge's allegation of disparate pay is not a new theory of recovery, but constitutes additional acts of discrimination in support of Newberry's discrimination claim. See Fairchild, 147 F.3d at 575 (explaining that later charge alleging termination relates back to earlier charge alleging failure to promote because both acts relate to subject matter of the original charge: sex discrimination). Accordingly, Newberry may sue on acts occurring within 300 days of his September 10, 1998 charge, and the January 2000 charge relates back to that charge.

**B.  Merits**

  **1.  Promotion Claim**

Like Leonard, Newberry offers no direct evidence that he was denied promotions because of his race. Therefore, he must establish a *prima facie* case of discrimination using indirect evidence. See Pafford, 148 F.3d at 669. Because Newberry's January 2000 charge relates back to his September

15

1998 charge, he may rely upon acts of discrimination occurring after November 15, 1997 (300 days prior to September 10, 1998). Newberry did not apply for posted positions and does not base his claim on his rejection for posted positions. Rather, Newberry claims he was denied promotions that were unposted and awarded to five fellow employees.[7]

Plaintiffs' response insufficiently addresses the merits of Newberry's Title VII promotion claim. Plaintiffs devote only a single footnote in rebuttal, claiming Newberry identified five employees who were promoted to positions for which he was qualified. It is not clear when these promotions occurred. From the vague deposition testimony cited by Newberry, the court can conclude only that three of the five promotions occurred after November 15, 1997. First, Newberry testified that in 1998, his supervisor, Steve Cohn, wrote a memorandum notifying Newberry he would become part of the "Bus Fast Fixit Team." Newberry Dep. at 6. In 1999, a newly hired employee was promoted to the team instead of Newberry despite Newberry's 10 years of experience. Id. p. 7. Second, Newberry testified that in 1999 he was mislead into believing he would be promoted to the "group-wise" department when the promotion went to another employee, Ashish Goyal, whom Newberry believed lacked background in programming. Id. p. 193. Third, Newberry testified that David Otto, a coworker in the help desk department, was promoted to a coordinator position although Newberry believed Otto did not know how to do the work associated with his help desk duties. Id. pp. 47-48 (it appears from the CTA's submissions that Otto was promoted in November 1998). Even if Chu, Goyal, and Otto were less qualified for the promotions (an issue for which Newberry cites no evidentiary support aside from his belief), Newberry offers no evidence demonstrating the CTA's

---

[7] Newberry may not sue on discrimination claims resulting from assignment to tasks outside his job description. Newberry believed as early as 1992 that this conduct constituted discrimination.

16

promotion decisions were pretextual -- that they were based on racially discriminatory reasons as opposed to a genuine, although mistaken, belief that Chu, Goyal, and Otto were better qualified. Accordingly, Newberry fails to establish a genuine issue of fact that he was denied promotions based on his race.

### 2. Pay Claim

As discussed, the disparate pay claim asserted in Newberry's January 2000 EEOC charge relates back to his September 1998 charge. Newberry testified that based on office gossip he believed he was paid less than five non-African-American co-employees (Robert Feller, Kevin Andeway, Chris Bartoli, Aditya Jani, and Steve Poster) who at one time held the same position as he. Newberry Dep. at 103-04. Newberry fails to establish facts supporting a reasonable inference of discriminatory disparate pay. First, Newberry's belief that he was paid less than Feller, Andeway, Bartoli, Jani, and Poster is insufficient to create a genuine issue of fact. The only evidence of disparate pay provided by Newberry is a chart submitted to the court after the CTA filed its summary judgment reply. Plaintiffs' Suppl. Resp. Ex. V. Of the five employees identified by Newberry, the chart only provides evidence of Feller's salary. Newberry claims the chart shows he was paid less than Russell Smith, a non-African-American employee holding the same job. Newberry did not identify Smith in his deposition or summary judgment response. The chart shows that in 1999, Newberry was paid $1,362 less than Smith (who held the same job as Newberry) and $5,586 less than Feller (who held the same grade level in the same department as Newberry). Id. However, Newberry does not sufficiently place the chart's data in context or explain the significance of other data in the chart that may explain the disparate salaries. For instance, Newberry does not account for the fact that Smith and Feller had, respectively, 11 and 5 more years of seniority than did he. Moreover, the chart shows that John Smith,

17

an African-American who also held the same job as Russell Smith and Newberry, received the same pay as Russell Smith. This does not support a finding that non-African-Americans with the same job as Newberry were paid more than African-Americans. The chart shows that four other African-Americans sharing Newberry's grade level and working in the same department (Glen Plott, Michael Clarke, Fred Collins, and Joanne Lewis) were each paid between $8,454 and $4,614 more than Newberry. Plott was paid more than Feller, and Clarke, Collins, and Lewis were each paid only $424 less than Feller although Feller held a different job. In sum, the raw data of the untimely submitted salary chart simply does not support a reasonable inference Newberry's salary was influenced by discrimination. Accordingly, summary judgment must be entered against Newberry on his Title VII discrimination claim.

### 3. Retaliation Claim

In Count V, Newberry alleges the CTA retaliated against him after he filed an internal complaint with the CTA's affirmative action unit on January 1, 1997. Newberry claims the retaliation violated both Title VII and § 1981. On April 19, 2000, this court held Newberry cannot sue under Title VII for retaliation occurring before he filed his amended EEOC charge in January 25, 2000. Newberry points to no evidence that he suffered retaliation after January 25, 2000. Accordingly, summary judgment must be granted against Newberry on his Title VII retaliation claim.

## **CONCLUSION**

The motions for summary judgment are granted.

ENTER:

*Suzanne B. Conlon*
Suzanne B. Conlon
United States District Judge

August 4, 2000