# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Suzanne B. Conlon | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 7614 | **DATE** | 4/4/2001 |
| **CASE TITLE** | ANNETTE M. ALLEN, et al. vs. CHICAGO TRANSIT AUTHORITY | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] The CTA's four motions for summary judgment [157-1, 158-1, 164-1, 167-1] are granted. Judgment is entered for defendant Chicago Transit Authority and against plaintiffs Annette M. Allen, Shelley S. Burnette, Earnest Leonard and Raphre Newberry on all remaining claims.

*Suzanne B. Conlon*

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | |
| ✓ | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | |
| | Docketing to mail notices. | |
| | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | |

number of notices

4|6|01
date docketed

C.S.
docketing deputy initials

4/4/2001
date mailed notice

Document Number

300

SB

courtroom deputy's initials

Date/time received in central Clerk's Office

jad
mailing deputy initials

DOCKETED

APR 0 6 2001

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ANNETTE M. ALLEN, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | No. 99 C 7614 |
| | ) | |
| v. | ) | Suzanne B. Conlon, Judge |
| | ) | |
| CHICAGO TRANSIT AUTHORITY | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

### Introduction

Before the court are four summary judgment motions filed by defendant Chicago Transit Authority ("CTA") to dispose of all remaining claims asserted by four African-American CTA employees who claim they were victims of racial discrimination.[1] To conserve judicial resources and avoid responding in kind to the parties' excessive proliferation of paper, the court consolidates its rulings on all four motions.

Preliminarily, the court notes that the decisional process is unduly burdened by the parties' disregard of Local Rule 56.1. The purported statements of uncontested facts, responses, additional facts, and replies are neither concise nor always factual. Instead, the purported facts are often clouded with impermissible conclusions, legal argument and citations to the record that do not support factual assertions. To the extent purported facts do not comply with Local Rule 56.1, they shall not be considered. *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920-23 (7th Cir. 1994). Properly disputed facts are noted.

---

[1] All claims of a fifth CTA employee, Brian Marshall, were voluntarily dismissed. Many of the claims of the remaining plaintiffs have been disposed of by prior motions to dismiss, for class certification and for summary judgment. *See* orders of July 24, 2000, July 28, 2000, August 4, 2000 and December 7, 2000.

## Legal Standard

The same legal standard applies to all four motions. Summary judgment is appropriate if the moving papers and affidavits show there is no genuine issue of material fact and the CTA is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *King v. National Human Res. Comm., Inc.*, 218 F. 3d 719, 723 (7th Cir. 2000). Each plaintiff must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. Fed. R. Civ. P. 56(3); *Silk v. City of Chicago*, 194 F.3d 788, 798 (7th Cir. 1999). The court considers the record as a whole and draws all reasonable inferences in the light most favorable to each plaintiff. *Bay v. Cassens Transp. Co.*, 212 F.3d 969, 972 (7th Cir. 2000). A genuine issue of material fact exists if the evidence is sufficient to enable a reasonable jury to return a verdict for that plaintiff. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000).

## I. Rahpre Newberry

### A. Background

The CTA moves for summary judgment against Newberry on his §§ 1981 and 1983 claims of discrimination in pay and promotions [Count II]. Newberry was hired by the CTA in February 1990 as a programmer analyst in the management information system department ("the computer department"), and initially was assigned to the mainframe area. Newberry had ten years of previous computer experience, including seven years as a computer operator and data processing field technician and three years as a computer programmer. He possessed an A.A. degree in data processing from Olive-Harvey College and a B.S. in computer science from Roosevelt University. Newberry completed 24 hours of undergraduate study to enhance his computer skills at DePaul University prior to starting at the CTA. In late June 1990, Newberry was promoted to senior programmer analyst at level eleven.[2] The general manager of the computer department was Kenneth Edwards, an African-American. Edwards ultimately made all hiring and promotion decisions for the computer department. In 1992, Newberry moved from the mainframe area to the PC/LAN area of

---

[2]CTA exempt employees are ranked from level six to twenty-five. In the computer department, positions range from levels nine to eighteen.

the computer department, headed manager Paul Olenski. At all relevant times, Newberry's immediate supervisor has been Stephen Cohn.

Through the employee assistance program, Newberry began a six-month leave of absence in mid-December 1997, with full pay, for emotional disability. While on leave, Newberry filed an internal handwritten-complaint with the CTA's affirmative action unit, based on events that occurred prior to his leave of absence. Newberry complained of race discrimination and harassment by his supervisor Olenski due to his desk being moved "more than any other employee." Pl. Ex. 27. Newberry did not request any remedy. *Id.* A typed-version of Newberry's internal complaint exists and differs from the handwritten complaint. The typed version claims Olenski and Edwards adversely treated Newberry because of his race by requiring him to work out of his job description, senior programmer analyst, for four years; not assigning him the duties of a senior programmer analyst; denying him the same pay increases as other senior programmer analysts; and moving him to different seating assignments five times. *Id.* Both versions of Newberry's complaint focus primarily on the effects of his 1992 transfer to the PC/LAN area under Olenski. *Id.*

Before his reinstatement in mid-June 1998, Newberry's title changed to office systems programmer analyst. He still reported directly to Cohn. However, Olenski left the CTA in September 1998, and Aditya Jani became Newberry's supervisor.

In late August 1998, the affirmative action unit issued a finding in response to Newberry's internal complaint, stating "there is cause to support your allegation of race and adverse treatment." Pl. Ex. 1. According to the report upon which the affirmative action unit's finding is based,

> Newberry has been adversely treated by being taken out of the position he was originally hired for, and was put into a position he was not as familiar with, yet being expected to perform at a level of experience dictated by management. Newberry's career opportunity as a programmer is also hindered because of the lack of experience and training he could have had if he was left in his area of expertise.

Pl. Ex. 2 at 10. The report recommended that Newberry be returned to his position of senior programmer analyst and increased from level twelve to thirteen. *Id.* at 11.

Edwards does not recall receiving the affirmative action unit's finding. Def. Ex. 12, Edwards dep. at 83-89. He believes the internal complaint was "thrown out, because [he] . . . wasn't asked to take any action by EEO or anything to redress or correct anything" that he can recall. *Id.*

Newberry does not sue the CTA based on either version of the internal affirmative action complaint. Newberry Resp. Br. at 1, n.2. Rather, he claims he was denied unposted promotions awarded to two fellow employees, David Otto and Ashish Goyal, months after the internal complaint was filed and the affirmative action unit issued its finding. *Id.* at 1, n. 2, 14.[3] Newberry's job performance is not a material issue, but his qualifications for Otto and Goyal's positions are at issue.

### 1. Otto's Promotion

Without applying or interviewing, Otto became network support coordinator at level fifteen in November 1998, a two-level promotion from his position as lead communication system planning analyst since his hire in 1990. As network support coordinator, Otto continued to staff the help desk, where he had been working for some time. Despite the promotion, Otto's duties remained essentially unchanged. In addition to Otto's CTA experience, Edwards based his decision on Otto's previous private employment experience in the communications field. Def. Ex. 12, Edwards dep. at 22-3, 69-70. Edwards did not base his decision on Otto's educational background.

Newberry claims he also has communications experience. Pl. Ex. 3. With regard to Otto's experience at the help desk, Newberry asserts that Edwards gave a different reason in his recommendation to promote Otto. Newberry contends Edwards' recommendation lists a variety of computer projects with which Otto was purportedly involved, and that Otto's involvement with these projects was minimal. Pl. Ex. 32; Pl. Ex. 10, Newberry decl. at ¶ 8. As evidence that Otto was not qualified for the promotion, Newberry asserts Otto did not perform his job well. Newberry often heard

---

[3] Newberry originally claimed unequal pay and promotion discrimination with regard to five CTA employees: Andrew Rizzuto, Bruce Weeks, David Chu, David Otto, and Ashish Goyal. He has abandoned all claims concerning Rizzuto, Weeks, and Chu. Newberry attempts to preserve his unequal pay claims against Otto and Goyal, Newberry Resp. Br. at 2, n. 2, but he offers no evidence to support these claims. The unequal pay claims with respect to Otto and Goyal are thus abandoned. Newberry contends in a footnote that the CTA has not moved for summary judgment on his claims of "unequal treatment in terms and conditions of employment" pointing to the class action allegations and deposition testimony. *Id.* at 1, n. 2. However, the motion for class certification was denied. Class claims are moot.

complaints about the inaccessibility of the help desk and Otto's frequent failure to answer the telephone. Pl. Ex. 10, Newberry decl. at ¶ 6. Newberry argues Otto performed so poorly that the CTA outsourced the help desk to an outside vendor, eliminating Otto's position. Newberry Facts ¶ 38; Newberry Resp. Br. at 9, n.11. Newberry concludes he was eminently qualified to perform the duties required for Otto's position.

## 2. Goyal's Promotion

After interviewing three or four people, Jani recommended Goyal to Edwards. Goyal was hired in March 1999 as senior office systems programmer analyst at level fourteen. This occurred a week before Newberry was promoted to level thirteen (within the period in which Newberry claims he was denied promotions). Def. Ex. 6,16. Goyal has no degree in computer science, unlike Newberry. Instead, Goyal has a bachelors degree in civil engineering and a masters degree in structural engineering. When interviewed by Jani, Goyal answered all technical questions correctly. Def. Ex. 24. Jani based his recommendation on Goyal's certifications, experience and the technical interview. Def. Ex. 20, Jani dep. at 24. Goyal's certification in Windows NT administration, and master's degree in engineering contributed to Jani's recommendation. *Id.* at 25. Newberry contends that Goyal did not have a Windows NT certification. Pl. Ex. 15. According to Edwards, Goyal was hired because he had "NT Novell network expertise." Def. Ex. 12, Edwards dep. at 51-52. Goyal had five years of practical NT Novell networking experience in maintaining and developing programs. Pl. Ex. 24; Def. Ex. 32, Rizzuto decl. at ¶¶ 12-13. Newberry contends that most of Goyal's prior work experience was in the field of engineering, not computers, and that Goyal's only computer-related work experience did not involve Groupwise, a program Goyal's position serviced. Pl. Ex. 15; Def. Ex. 25, Goyal dep. 10-16. Newberry claims he was familiar with Novell. Newberry Facts ¶ 97; Pl. Ex. 10, Newberry decl. at ¶ 13. Newberry concludes Edwards' and Jani's reasons for hiring Goyal differ because Edwards said Goyal had experience with a certain program, and Jani did not mention this in his recommendation. Newberry Facts ¶ 93.

As evidence that Goyal was unqualified, Newberry asserts Goyal did not perform his job well and required training in areas in which he had limited experience. *Id.* ¶ 57. For example, Newberry claims Goyal had to refer to his notes in order to diagnose computer problems. *Id.* ¶ 57. Newberry observed more complaints about Groupwise after Goyal was hired than before. *Id.* ¶ 58.

Cohn told Newberry before Goyal was hired that Newberry would manage Groupwise; Newberry spent a day or so training with Jani, then Groupwise manager. Newberry Facts ¶ 54; Def. Ex. 2, Newberry dep. at 62, 193; Pl. Ex. 10, Newberry decl. at ¶ 11. Finally, Newberry argues that he is qualified to perform the duties required for Goyal's position, and to the extent he is not, with training he could be.

## B. Analysis

### Section 1981 promotion claims

Section 1981 prohibits racial discrimination with respect to making and enforcing contracts. 42 U.S.C. § 1981. In order to bring a §1981 claim, there must be a contract. *Gonzales v. Ingersoll Milling Machine Co* ., 133 F.3d 1025, 1034 (7th Cir. 1998). The Seventh Circuit has not directly addressed this issue, but the weight of authority suggests employment at-will provides a sufficient contractual relationship to state a claim under §1981. Other circuits have decided that at-will contracts support a § 1981 claim. *See Perry v. Woodward*, 199 F.3d 1126 (10th Cir. 1999); *Spriggs v. Diamond Auto Glass*, 165 F.3d 1015 (4th Cir. 1999); *Fadeyi v. Planned Parenthood Ass'n of Lubbock, Inc.*, 160 F.3d 1048 (5th Cir. 1998). These decisions are consistent with the nature of at-will employment. The courts in *Spriggs* and *Fadeyi* relied on a Seventh Circuit discussion of the nature of at-will employment. In *McKnight v. General Motors Corp.*, the court observed:

> Employment at will is not a state of nature but a continuing contractual relation. Wages, benefits, duties, working conditions, and all (but one) of the other terms are specified and a breach of any of them will give the employee a cause of action for breach of contract. All that is missing is a provision that gives the contract a fixed term or that entitles one or both parties to a specified amount of notice before the other party can cancel the contract without liability. A contract for employment at will may end abruptly but it is a real and continuing contract nonetheless. . . .

908 F.2d 104, 109 (7th Cir. 1990) (citations omitted). In recent cases this court has repeatedly concluded at-will employees may bring employment discrimination claims under § 1981. *See Riad v. 520 S. Michigan Ave. Assoc. Ltd.,* 78 F. Supp.2d 748 (N.D. Ill.1999); *Jones v. Sabis Educ. Sys.*, 52 F. Supp.2d 868, 875-76 (N.D. Ill. 1999); *Daniels v. Nationwide Ins.*, No. 99 C 0757, 1999 WL 495649, at *1-2 (N.D. Ill. June 28, 1999); *Melton v. Five Four Corp.*, No. 99 C 1274, 1999 WL

436572, at *1-2 (N.D. Ill. June 22, 1999); *Gandy v.. Gateway Foundation*, No. 99 C 2286, 1999 WL 102777, at *17-18 (N.D. Ill. Feb. 22, 1999).

The CTA has failed to establish as a matter of law that Newberry cannot pursue a § 1981 claim as an at-will employee. Nevertheless, Newberry has not presented sufficient evidence to survive the CTA's motion for summary judgment. To succeed on his claims that he was discriminatorily denied promotions, Newberry must present either direct evidence that he was discriminated against or proceed under the indirect method set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-805 (1973).

**Direct Evidence**

**1.      The Affirmative Action Unit's Report and Finding of Cause**

Newberry claims that the CTA admitted he was a victim of discrimination because it issued a finding in August 1998, that there was cause to support his allegations. Shirley Billingslea, a CTA equal employment officer, conducted the investigation, wrote a report, and recommended the affirmative action unit issue the finding of cause. Billingslea's report was reviewed and approved by Ellis Kendricks, manager of the affirmative action unit, and his superior, Pamela Beavers, general manager of the equal employment department. Pl. Ex. 28, Billingslea decl. at ¶ 5; Pl. Ex. 29, Beavers Aff. at ¶¶ 16-19. Without Kendricks and Beavers' approval, no finding of cause could issue. The report would simply be a recommendation or might be redrafted to articulate a different conclusion. There is no evidence the CTA adopted Billingslea's report or finding of cause. Her supervisors' approval does not alter this. It is undisputed the CTA did not implement the report's recommendation to reinstate Newberry to his position as senior programmer analyst with an increase from level twelve to thirteen. The CTA's failure to implement the report's recommendation suggests an act of genuine disagreement, rather than a formal or informal adoption of Billingslea's finding. *See Tuohey v. Chicago Park Dist.*, 148 F.3d 735, 741-2 (7th Cir. 1998). Thus, the CTA did not admit it discriminated against Newberry when the affirmative action unit issued its finding of cause for Newberry's internal complaint. Id. at 739.

Further, Newberry's internal complaint involves events prior to mid-December 1997. The statute of limitations for §§ 1981 and 1983 bar an action premised on these events. *Hall v. Burlington N. Santa Fe*, 977 F. Supp. 1344, 1345 (N.D. Ill. 1997) (§ 1981's statute of limitations is two years and

continuing violation doctrine unavailable if plaintiff knows after each act it was discriminatory); *Treece v. Naperville*, 903 F. Supp. 1251, 1257 (N.D. Ill. 1995) (same). Moreover, Newberry's internal complaint does not involve Otto or Goyal's promotions.[4] Nor could they, because Otto was promoted in November 1998 and Goyal in March 1999. Thus, the report (issued in August 1998) is not direct evidence that the CTA subsequently discriminated against Newberry.

The report made findings for the period late April 1995 to late August 1998. Pl. Ex. 2 at 6; Pl. Ex. 1. Newberry contends that certain findings are particularly relevant. The report found that the computer department promoted five females and nine males. Pl. Ex. 2 at 6. The race and sex are as follows: 1 Hispanic/female; 1 white/female; 3 black females; 1 black male; 1 Asian male; 1 East Indian male and 6 white males. *Id.* The report noted the computer department employed 22 black males, and that there are no blacks in the computer department with a manager's title. The report inexplicably excluded Edwards, the general manager, from both findings. *Id.* There were 38 white males in the computer department, five with manager's titles. *Id.* The source of these findings is undisclosed. The report does not address the qualifications of managers compared with candidates who did not receive promotions to that position. *See Vanasco v. National-Louis Univ.*, 137 F.3d 962, 967 (7th Cir. 1998) (raw numbers regarding ages of candidates granted and denied promotions without analysis of relative qualifications do not support a claim of age discrimination). Nor does the report address the number of black candidates and whether the positions were posted. If the positions were posted, candidates were required to apply for the position as an element of a *prima facie* case for a failure to promote claim. *Perdomo v. Browner*, 67 F.3d 140, 144 (7th Cir. 1995). It is uncontested that Newberry never applied for a posted position.[5] Nevertheless, based on Billingslea's raw numbers, she opines:

------

[4] The internal complaint focuses on his transfer in 1992. Newberry cannot base his present claim on this transfer because it is well outside of the statute of limitations and he believed it was discriminatory prior to the date the period of limitations expired. *Hall*, 977 F. Supp. at 1345; *Treece*, 903 F. Supp. at 1257. Newberry's internal complaint (other than possibly changing seat assignments) is based entirely upon assignments outside his job description. Newberry may not sue on these claims. *See* Memorandum Opinion and Order of August 4, 2000.

[5] Newberry's explanation why he did not apply for any posted position does not alter the fact that he did not apply. Def. Ex. 2, Newberry dep. at 78-88, 185-96, 201-02.

The lack of black males being promoted [between late April 1995 to August 1998] gives some credence to Newberry's complaint of race discrimination. Because white males are in a position to recommend promotions or transfers, it is very likely that white males will continue to be in management positions and minority males will continue to be underutilized.

Pl. Ex. 2 at 9, 10. Billingslea's opinion ignores that Edwards, the general manger of the computer department, is African-American. It is undisputed that Edwards made all hiring and promotion decisions. Edwards testified that because he is African-American, he has "always been sensitive to issues of diversity" in his department and tries to "identify opportunities to promote qualified female and minority candidates into supervisory-level positions". Def. Ex. 22, Edwards aff. at ¶ 4. According to Billingslea's own reasoning, because Edwards is an African-American and he was in a position to promote or transfer, she should have reached the opposite conclusion. The report and its findings do not constitute competent or admissible evidence of a pattern of discrimination in the computer department. Therefore, the report is insufficient to create a genuine issue of material fact that Newberry's failure to be promoted to the positions Otto and Goyal presently occupy is the result of discrimination.

**B.    Deborah Grant's Testimony**

Newberry proffers the testimony of Deborah Grant as direct evidence that the CTA discriminated against him. Grant, an African-American in the computer department, has an extensive education and experience in computer science. Pl. Ex. 30, Grant dep. at 14-16, 25. Grant testified at length about problems she experienced with Olenski, her supervisor until 1992. *Id.* at 18-48. Olenski did not approve training Grant felt she needed and Grant did not feel her skills were fully utilized. *Id.* at 18-26. However, Edwards intervened and approved Grant's training requests. *Id.* at 20-22. Grant does not identify race as the motivation for Olenski's conduct. *Id.* at 18-48. Grant's experiences with Olenski do not support Newberry's claims.

Over the years, Grant had conversations with computer department colleagues about the practice of promoting without job posting and the resulting lack of opportunity for older technical staff members to bid on mid-management positions. *Id.* at 54-55. She offers no times, dates places, people, or specific promotions for these conversations. *Id.* These hearsay statements do not constitute

9

competent evidence that a pattern of discrimination existed in the computer department. Nor did Grant offer testimony about the promotions at issue.

Finally, Newberry offers no legal support for his argument that Grant's testimony constitutes direct evidence of discrimination against him.

### 3. Harassment

Newberry claims he was harassed by being required to change seats against his will and he was given undesirable seating assignments. Newberry Facts ¶ 26. However, he does not provide any specifics of these moves except that they occurred after he was transferred to Olenski. Newberry provides one example that he claims occurred "within the past month," but that was after the last date of his deposition (May 11, 2000), and he stipulated that he will not place at issue any allegedly discriminatory acts after that date. Pl. Ex. 10, Newberry decl. at ¶ 19; Def. Ex. 15. Finally, Newberry does not explain how changing seat assignments was related to his failure to promote claims regarding Otto and Goyal or how changing seat assignments is based on his race.

Newberry claims that he "continues to be given little or no work to do, or is given work that is beneath his qualifications and job description, or is given work for which he needs additional training, which he is denied." Newberry Resp. Br. at 7; Newberry Facts ¶ 26; Pl. Ex. 10, Newberry decl. at ¶ 22.[6] However, in the declaration that Newberry cites as support, he does not attest he was given little or no work to do. Pl. Ex. 10, Newberry decl. at ¶¶ 17, 22-23. Newberry is not entitled to complain unless these assignments were a mask for discrimination. *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1571 (7th Cir. 1989). The CTA explains that because the computer field changes rapidly, it was common for computer department employees' duties to change and job descriptions to become outdated. Def. Ex. 8, Cohn dep. at 30-31; Def. Ex. 9, Olenski dep. at 107-09. Newberry does not explain how the work he was given was based on race, other than his unsupported conclusion that "[n]on-African-Americans do not suffer these indignities." Newberry Resp. Br. at 7; Newberry Facts ¶ 26. This is not direct evidence of discrimination. Finally, Newberry's claim is premised on the failure to promote him into the positions Otto and Goyal now occupy. He abandoned any claims based on "continu[ing]" alleged discriminatory conduct. Def. Ex. 15.

---

[6] In March 1999, during the period Newberry claims he was denied promotions, he received a promotion from level twelve to thirteen. Newberry Resp. ¶ 12.

Newberry claims that white CTA supervisors acknowledge there may be some reaction to his appearance; he has dreadlocked hair and wears Afro-centric clothes. Newberry suggests, but does not overtly claim, that this possible reaction by unidentified supervisors was race-based. Newberry does not contend his appearance has had a negative effect on his career, or that it was considered by the CTA when deciding to promote Otto and Goyal instead of himself. Indeed, Cohn testified that within the computer department, dreadlocks have no impact on the perception of Newberry. Def. Ex. 8, Cohn dep. at 57. Cohn did not testify about Newberry's clothes. *Id.* Olenski testified that Newberry's appearance did not hinder his ability to advance in the computer department. Def. Ex. 9, Olenski dep. at 63-4. Newberry's assertions about the effect of his appearance are speculative and do not constitute direct evidence of discrimination.

### 4.     The Statistical Expert

Newberry proffers as direct evidence of discrimination declaration by a data-base/statistical consultant, Whitman T. Soule. Newberry Resp. Br. at 7; Pl. Ex. 6. Soule's declaration is not considered for the following reasons: Newberry failed to comply with the expert disclosure requirements of Fed. R. Civ. P. 26(a)(2) and this court's scheduling order; Newberry never sought leave to identify an expert after the disclosure deadline, and Newberry orally and in writing informed the CTA that he would not present any expert opinions or materials in this case. Def. Mot. to Strike at 2, 4, Ex. 1-2. As a result, Newberry's statistics cannot be considered as direct evidence of discrimination.

### E.     The "Mosaic of Discrimination"

Newberry argues that collectively the direct evidence creates a convincing "mosaic of discrimination" warranting denial of summary judgment. *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). However, each proffered item of direct evidence is insufficient to establish a genuine issue of material fact. Taken together, the proffered evidence remains insufficient to establish that Newberry was a victim of discrimination.

### The Indirect Method

### 1.     *Prima Facie* Case

In order to establish a *prima facie* case of race discrimination, Newberry must show: he belongs to a racial minority; he applied and was qualified for a job for which the employer was seeking

applicants; that despite his qualifications, he was rejected; and the position was given to someone of a different race who had similar or lesser qualifications. *Perdomo*, 67 F.3d at 144. To satisfy the application requirement where jobs are not posted, Newberry must show he would have applied if the jobs were posted. *Jaffe v. Johnson*, No. 86 C 7818, 1988 WL 37694, at *5 (N.D. Ill. Apr. 19, 1988); *Rogers v. Peninsular Steel Co.*, 542 F.Supp. 1215, 1220 (N.D. Ohio 1982), *cited in Box v. A & P Tea Co.*, 773 F.2d 1372, 1376 (7th Cir. 1985).

Once a *prima facie* case is established, the burden of production shifts to the CTA to articulate a legitimate, nondiscriminatory reason for its actions. *See Courtney v. Biosound, Inc.*, 42 F.3d 414, 418 (7th Cir.1994). If a nondiscriminatory reason is articulated, the CTA satisfies its burden and Newberry must establish that the CTA's reason was pretextual. *Id.*; *Perdomo*, 67 F.3d at 144. In order to survive the CTA's summary judgment motion, Newberry must show that a reasonable fact finder could infer that the CTA did not honestly believe the reason for the employment decision. *Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1124 (7th Cir.1994).

Newberry satisfies the first element of the prima facie case -- he is African-American. To satisfy the second element, Newberry must show that had Otto and Goyal's positions been posted, he would have applied. He has failed to do so. It is undisputed that he never applied for a posted position. He explains that but for being taken out of his career path in 1992 (when he was switched to the PC/LAN area), he would be qualified for many positions and could have applied for posted positions. Def. Ex. 2, Newberry dep. at 185-88, 195.

### 2. Qualifications of Otto and Newberry

The parties have not submitted a job description for Otto's position. However, Otto's supervisors testified that his job duties consist of coordinating varied responsibilities: logging all help desk inquiries; performing troubleshooting by telephone; determining when repairs are a vendor's responsibility; interacting with vendors; and assigning tasks to technicians in the field. Def. Ex. 32, Rizzuto decl. at ¶ 8. This involves both the mainframe and the PC/LAN areas of the computer department. Def. Ex. 8, Cohn dep. at 53. Otto "perform[s] a kind of triage regarding computer-related problems of all kinds." Def. Ex. 32, Rizzuto decl. at ¶ 8. This job requires "[s]upervisory capability . . . an understanding of systems from a network standpoint, from an application standpoint. . . . an understanding of network configurations." Def. Ex. 12, Edwards dep. at 69-70.

Edwards based his decision on Otto's two and a half years of experience working at the help desk and Otto's previous experience in the communications field. Def. Ex. 12, Edwards dep. at 22-23, 69-70. Newberry claims that Edwards' recommendation to promote Otto differs from Edwards' testimony, listing a variety of computer projects that Otto was involved with. Pl. Ex. 32. Edwards' recommendation states the help desk supported a wide variety of computer technology, and that Otto supervised the group, with heavy management involvement in implementing technologies and increasing his management skills. *Id.* This does not contradict Edwards' testimony. Nor does Newberry support his assertion that Otto's involvement with these projects was minimal. Newberry Facts ¶ 101; Pl. Ex. 10, Newberry decl. at ¶ 8.

Edwards testified Newberry was not considered for the position of network support coordinator because he was unqualified. Def. Ex. 12, Edwards dep. at 69. According to Edwards, Newberry "had not demonstrated having a rounded, well-founded experience level or skill sets in those areas [network systems and configurations] ... other than what he had learned since he had moved over into the PC area." Def. Ex. 12, Edwards dep. at 69-70.

Newberry contends that the "basic help desk functions" involve fixing computer problems on site, determining when a computer needs to be sent to a vendor for repairs, and to help resolve virus and Internet problems. Pl. Ex. 10, Newberry decl. at ¶ 5. He bases his contention on Otto's testimony about his job. Def. Ex. 23, Otto dep. at 13. However, an employee does not write his own job description. *Palucki v. Sears, Roebuck & Company*, 879 F.2d 1568, 1571 (7th Cir. 1989); *Ester v. Derwinski*, No. 90 C 2853, 1992 WL 71767, at *5 (N.D. Ill. Apr. 1, 1992). Newberry contends he performed all these functions, and thus was qualified for the position. Pl. Ex. 10, Newberry decl. at ¶ 5. Newberry asserts that a substantial part of the network coordinator position involves simply sending computer department staff, including himself, out to solve CTA computer problems. Newberry Facts ¶ 34. Newberry cites as support his own testimony (which does not support his contention) and Otto's testimony. This is irrelevant. *Palucki*, 879 F.2d 1571; *Ester*, No. 90 C 2853, 1992 WL 71767, at *5. Finally, Newberry claims he has communications experience. However, he cites a 1990 staffing memo and hire notice that does not even remotely support his assertion. Pl. Ex. 3. Because Newberry offers no evidence that he possesses the job qualifications, he cannot establish a *prima facie* case of discrimination with regard to the CTA's failure to promote him to Otto's present position.

### 3. Qualifications of Goyal and Newberry

The parties have not submitted a job description for Goyal's position. Goyal's performance review indicates his job duties include Groupwise, Novell Netware support maintenance; Groupwise 4.1a connectivity with Groupwise 5.5; Groupwise CTA link with City of Chicago; CTA routers; NT servers for Solomon application and property accounting; and RS6000, Unix/AIX fueling system replacement for series I to meet Y2K compliance. Pl. Ex. 19. These duties include the CTA's Groupwise Internet service. Def. Ex. 32, Rizzuto decl. at ¶ 14. Newberry claims Goyal was hired only to manage and administer Groupwise, the CTA's e-mail program, without identifying any basis for his purported personal knowledge. Pl. Ex. 9, Newberry dep. at 193, Pl. Ex. 10, Newberry decl. at ¶ 9. To the extent Goyal has undertaken some duties with which Newberry does not have experience, Newberry claims that with appropriate training and support, he would have been able to master those duties too. Newberry Facts ¶ 65; Pl. Ex. 10, Newberry decl. at ¶ 13. Newberry's self-assessment carries no weight. *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1460 (7th Cir. 1994) (and cases collected therein).

Jani conducted a technical interview with Goyal, who answered all questions correctly. Def. Ex. 24. Jani based his recommendation on Goyal's certifications, experience and the technical interview. Def. Ex. 20, Jani dep. at 24. Goyal's certification in Windows NT administration, and master's degree in engineering contributed to his recommendation. *Id.* at 25. Newberry contends that Goyal did not have a Windows NT certification because Goyal's resume has Windows NT listed as one of the courses Goyal took. Pl. Ex. 15. This has no bearing on whether Goyal had the certification. Further, the only difference between Windows NT administration certification and completion of a course is passing an examination administered by a central authority. Def. Ex. 20, Jani dep. at 25-6.

Edwards testified Goyal was hired because he had "NT Novell network expertise," which he described as knowing "how to put a network together, . . . how to support it, . . . how to establish e-mail parameters, . . . how to go in and manage servers, . . . how to configure servers, application servers, network servers," which is a "combination of both" "hardware skill and software skills." Def. Ex. 12, Edwards dep. at 51-52. Goyal had five years of practical NT Novell networking experience in maintaining and developing programs. Pl. Ex. 24; Def. Ex. 32, Rizzuto decl. at ¶¶ 12-13. Newberry claims he was also familiar with Novell, but does not explain the level of his familiarity, and certainly

does not claim to have five years of practical NT Novell networking experience in maintaining and developing programs. Newberry Facts ¶ 97; Pl. Ex. 10, Newberry decl. at ¶ 13. Thus, Newberry did not possess a critical qualification for the position.

Newberry contends that most of Goyal's prior work experience was in the engineering field, not with computers, and Goyal's only computer-related work experience did not involve Groupwise. Pl. Ex. 15; Def. Ex. 25, Goyal dep. 10-16. However, Novell is a Groupwise system and Goyal's course work and previous job dealt with Novell. Pl. Ex. 15; Def. Ex. 25, Goyal dep. at 12-13.

Edwards testified that Newberry was not considered for the position because Newberry was unqualified and lacked a background in NT Novell expertise. Def. Ex. 12, Edwards dep. at 55. Newberry contends that he and Goyal had similar training in Windows NT -- a short course taken in late 1998 or early 1999. Newberry Facts ¶ 70; Pl. Ex. 17. Goyal attended two weeks of training for half days, while Newberry had four full days of training. Pl. Ex. 10, Newberry decl. at ¶ 13, 17; Def. Ex. 25, Goyal dep. at 48-49. Even if Goyal and Newberry's Windows NT training were similar, it does not compare with five years of practical experience with NT Novell. Pl. Ex. 15, 24.

Newberry argues Edwards' and Jani's reasons for hiring Goyal differ because Edwards said Goyal had experience with a certain program, and Jani did not mention this. Newberry Facts ¶ 93. However, Edwards testified Goyal was hired because he had "NT Novell network expertise." Def. Ex. 12, Edwards dep. at 51-52. Jani's written recommendation is not inconsistent with this explanation. Pl. Ex. 24. In fact, Jani recommended Goyal in large part because of his NT network experience. *Id.*

Newberry contends he worked with Groupwise for years, troubleshooting and resolving users' problems with the program. Newberry Facts ¶ 53. And since Groupwise was tailored to meet the CTA's needs, Newberry, who had been at the CTA for nine years, had more experience with the particular program and its peculiarities than did the new hire Goyal. Pl. Ex. 10, Newberry decl. at ¶ 10. Newberry contends he could diagnose problems with Groupwise and prescribe treatment based on his wealth of CTA experience. Newberry Facts ¶ 60. He knew the Groupwise users and understood the types of problems they encountered. *Id.* This is a self-serving, conclusory assessment of his own abilities. In addition, these opinions do not change the fact that the CTA selected Goyal based on his five years of practical experience with NT networking. Newberry did not possess comparable experience. Nor did Newberry's experience encompass all of Goyal's job duties.

15

Newberry further contends that Cohn told him before Goyal was hired that Newberry would be taking over Groupwise management. Newberry Facts ¶ 54; Pl. Ex. 10, Newberry decl. at ¶ 11. However, Newberry's own deposition contradicts this declaration. Newberry testified that Cohn spoke to him about an unspecified promotion or salary increase, and stated that Newberry was also "going to be working in the group-wise e-mail system." Def. Ex. 2, Newberry dep. at 60-63. *EEOC v. UPS*, 94 F.3d 314, 316, n.2 (7th Cir. 1996) (party cannot create a genuine issue of material fact by submitting an affidavit that contradicts prior deposition testimony); *Adelman-Tremblay v. Jewel Cos., Inc.*, 859 F.2d 517, 520-21 (7th Cir.1988) (same).

Newberry contends he spent a day or so training with Jani, then Groupwise manager. Def. Ex. 2, Newberry dep. at 193; Pl. Ex. 10, Newberry decl. at ¶ 11. Jani trained Newberry for a day on the CTA's e-mail system in November 1998. Based on this experience, Jani considered Newberry's performance to just meet expectations. Def. Ex. 20, Jani dep. at 40-41. There is no evidence that Jani trained Newberry for a day in anticipation of Newberry managing Groupwise. In fact, one of Newberry's performance goals for 1999, to acquire knowledge of Groupwise, suggests otherwise. Pl. Ex. 18.

Part of Goyal's job was to ensure Y2K compliance on the CTA's PCs. Pl. Ex. 19. Newberry claims Y2K compliance for PCs was one of his special responsibilities; that he was responsible for testing PCs to determine if they were Y2K compatible and upgrading them as needed Newberry Facts ¶¶ 62-63. This was only one of Goyal's job duties. Based on performance evaluations, Newberry and Goyal performed the task equally well. Pl. Ex. 18; Pl. Ex. 19.

Newberry contends Goyal could not solve or even diagnose problems. Newberry Facts ¶ 57. Instead, Goyal had to refer to his notes. Pl. Ex. 10, Newberry decl. at ¶ 14. Newberry is not competent to testify about Goyal's state of mind. Moreover, Goyal's performance evaluation strongly suggests Goyal is competent. Pl. Ex. 19. Goyal received a 4.7 average on a 5.0 scale. *Id.* For problem-solving (defined in the performance review as accurately diagnoses problems and develops appropriate solutions), Goyal received the highest mark. *Id.*

In sum, Newberry's endless negative opinions about Goyal's actual job performance are neither supported by the record nor do they establish a *prima facie* case that Newberry was qualified for Goyal's position.

## II. Annette M. Allen and Shelley S. Burnette

### A. Background

The CTA moves for summary judgment on Allen and Burnett's claims of discrimination in promotions under Title VII [Count I]. Allen was hired by the employment and placement section in late March 1986 as a secretary. The head of the personnel services department, Geraldine Tapling, interviewed Allen and recommended her. Allen was a direct hire, and her position was not posted. Allen's pre-CTA experience was clerical, and did not relate to personnel or human resources. In May 1987, Tapling promoted Allen to another clerical position. In November 1989, Tapling promoted Allen to an unposted position, occupational adjustment representative. This position combined clerical duties with interviewing and placing employees returning from disability. Tapling created this position especially for Allen to serve as a bridge from clerical into professional personnel work, and to give Allen experience so she could advance in the personnel department. Less than a year later, in August 1990, Tapling promoted Allen to personnel specialist, a position that involves interviewing candidates for employment. In March 1995, Tapling promoted Allen again to her present unposted position, senior personnel specialist. Allen obtained a bachelors degree from Governors State University in business administration in 1997. Her course of study did not include any personnel or human resources courses.

Burnette was hired by the employment and placement section in June 1987 as a senior personnel specialist. Burnette's position was not posted. Burnette finished high school in 1969, and had been in and out of the workforce starting in 1974, with various clerical jobs interspersed with periods of school or unemployment. In 1983, Burnette received a bachelors degree in personnel management from the University of Maryland. From 1984 to 1986, she worked as a personnel specialist. When Burnette applied to the CTA, she had been unemployed for about eight months.

### 1. The 1995 Promotion

In 1994, Tapling expected two employment and placement managers, Ruth Brown and Bill Fudala, to retire in a few years, and began to consider replacements. Because she expected they would retire about the same time, she thought about staffing the positions with people who would work

together as a team. Tapling wanted to promote managers from within the employment and placement section and she anticipated that Pedro Lebron and Allen would become managers. Pl. Ex. H, Tapling dep. at 236. Lebron is Hispanic. Allen was "definitely [Tapling's] second candidate. There were some concerns at that time that [Tapling] hoped would . . . prove to not be problematic." *Id.* at 237. In order to help organize her thoughts about filling the positions, Tapling jotted them down on paper. Her notes include a list of the strengths and weaknesses of each personnel specialist, including Allen, Brunette and Lebron.

Prior to Brown's retirement -- as an experiment handled by both Brown and Fudala -- Allen, Burnette and Lebron filled in as managers. *Id.* at 70-72. Allen and Burnette handled their assignments well. *Id.* However, Tapling did not consider temporary manager positions as indicative because "it's a false scenario. The person is sitting in the job -- or in the desk moving the paper, but they're not the manager. [Brown] is still there to help them." *Id.* at 71. Brown retired late in 1994. Among those interviewed for the position were Allen, Burnette and Lebron. Lebron resigned in late January 1995, after interviewing for Brown's position. In February 1995, Tapling offered Allen the manager position. Def. Ex. 6, Allen dep. at 212-13. Allen accepted. *Id.* Despite this, in early March 1995, Tapling announced that Lebron received the manager position. When Allen asked Tapling for an explanation, Tapling explained a personnel specialist could not leapfrog over a senior personnel specialist to a manager's position. *Id.* at 214-15. Tapling denies this conversation. Pl. Ex. H, Tapling dep. at 267. Although Allen was upset by the decision to promote Lebron, she accepted Tapling's reason that a personnel specialist could not leapfrog to manager. Def. Ex. 6, Allen dep. at 213-16. Tapling gave Allen no other reason she was not promoted in 1995; Allen had no reason at that time to disbelieve Tapling's explanation for not receiving the 1995 promotion. Pl. Ex. I, Allen decl. at ¶¶ 28-29. Allen never perceived racism or other discrimination directed toward her in all her nine years at the CTA and had no reason to believe that the 1995 promotion decision was racially motivated. *Id.*

Burnette disagreed with the decision to promote Lebron in 1995, but did not believe she was the victim of discrimination. Def. Ex. 7, Burnette dep. at 125-30; Pl. Ex. J, Burnette decl. at ¶ 17. Burnette had no reason to attribute the 1995 promotion decision to racism; she never perceived racism directed toward her in her eight years at the CTA. *Id.* at ¶ 17.

## 2. The 1997 Promotion

Fudala announced in 1997 that he would retire. According to the CTA's affirmative action plan, it is the policy to promote from within and most vacancies are posted. Pl. Ex. F at 57. Thomas Czech, Tapling's supervisor, decided not to post Fudala's position because he believed the budget department would eliminate the position if it became aware of the vacancy. Pl. Ex. K, Czech dep. at 81; Def. Ex. 31, 32, Illinois Department of Human Rights ("IDHR") report at 2. To avoid this, Czech wanted to act quickly to find a suitable candidate within the personnel services department. Tapling agreed with Czech's reasons for not posting the position. Pl. Ex. H, Tapling dep. at 172-73; Def. Ex. 31, 32 at 2. Allen and Burnette heard the position was to be eliminated by the budget. Def. Ex. 6, Allen dep. at 308-09; Def. Ex. 7, Burnette dep. at 165-66. Allen and Burnette claim that not posting the 1997 position was a deviation from the CTA's policy of posting positions. Def. Ex. 6, Allen dep. at 335; Def. Ex. 7, Burnette dep. at 79-80. However, Allen was aware that exempt positions were not always posted and she had in fact received unposted exempt promotions. Def. Ex. 6, Allen dep. 334-35. Burnette was also aware that not all exempt positions were posted and her job was not posted. Def. Ex. 7, Burnette dep. at 79-81. Allen and Burnette contend that they had no opportunity to apply for the 1997 position because it was not posted. Def. Ex. 1, Second Am. Comp. at ¶ 22, 44. But it is undisputed that they were both considered for the 1997 promotion. Def. Ex. 2, Tapling decl. at ¶¶ 77-87. Thus, it is immaterial that the position was not posted.

According to Tapling, Czech told her in late summer about Fudala's expected vacancy and that she had to move quickly. Def. Ex. 2, Tapling decl. at ¶ 73; Pl. Ex. H, Tapling dep. at 188-89. Czech told Tapling not to make a decision without interviewing the candidates and reporting back to him. Pl. Ex. K, Czech dep. at 76-81. Czech testified that maintaining institutional knowledge and the interview were important criteria in replacing Fudala. *Id.* at 78-80. In Czech's view, whether an employee is actually qualified for the job depends on the interview and how well the employee presents himself or herself. *Id.* at 78. Czech would not have made the 1997 promotion decision without first obtaining interview results. *Id.* at 78-80.

After Czech told Tapling to consider candidates for Fudala's vacancy, Czech had to remind Tapling to complete the task. *Id.* at 86-87. Tapling evaluated candidates from the personnel department only, and assumed all personal specialists were interested. Def. Ex. 2, Tapling decl. at ¶

19

74. Tapling did not inform any of the personnel specialists that she was considering them for Fudala's position, nor did she involve Lebron in the process. After her initial meeting with Czech, Tapling compiled handwritten notes comparing the strengths and weaknesses of each candidate and met with Czech to review her considerations. Pl. Ex. H, Tapling dep. at 194; Def. Ex. 2, Tapling decl. at ¶ 98. Tapling identified Allen's strengths as good technical skills; good interactions with departments; professionalism; conscientiousness about her assignments, and good office experience as a personnel specialist. For Burnette, Tapling noted only two positives: she was organized, and she took her work seriously inasmuch as she completed her projects and did appropriate follow-up.

Tapling evaluated Patrick Reilly, who was the newest personnel specialist. Reilly is white. In 1996 through early 1997, the personnel services department was responsible for changing the photo identification system for nearly 13,000 CTA employees. The CTA purchased a new computer system, and the department had to issue every employee a photo identification. Reilly learned the system and designed special identification cards. Tapling noted that Reilly had taken a professional human resources course through the Society for Human Resources Management and received his certification. Reilly acted on his own initiative, after work. Reilly also had a master's degree. Tapling noted that Reilly conducted himself as a professional by dressing appropriately for the job and articulating his thoughts in a professional manner. After Reilly was promoted to the position of personnel specialist, he voluntarily spent extra time training the new occupational adjustment specialist. Only one negative was noted: he was sometimes too laid back and would play jokes.

Tapling made a similar list of positives and negatives about Jeffery Gadomski and Earline Marshall, the other two personnel specialists. Gadomski is white. Marshall is African-American.

Tapling and Czech discussed the candidates Tapling was to interview for the manager position, including Allen, Burnette and Reilly. Pl. Ex. K, Czech dep. at 89. Tapling told Czech she had conducted interviews of all candidates for the position and had prepared a list of various factors she was considering in the form of a matrix. *Id.* at 88-89. According to Czech, Tapling showed him her handwritten notes about the candidates; Czech told Tapling he wanted to see the matrix. *Id.* at 120-21. Tapling then synthesized factors she considered. Def. Ex. 2, Tapling decl. at ¶ 98. Tapling reviewed the personnel jackets of each personnel specialist to refresh her memory regarding education and experience. Tapling's matrix included the following columns: education, entry service date, job history,

job exposures and computer skills. She made notes in each column for each candidate, and then made her recommendation to Czech. Tapling chose Reilly as the best candidate. *Id.* at ¶¶ 99-100. Tapling reviewed the matrix with Czech, and Czech agreed with her recommendation of Reilly. Pl. Ex. H, Tapling dep. at 272-73. According to Czech, Tapling told him Reilly had done very well in his interview and that Allen did poorly in hers. Pl. Ex. K, Czech dep. at 90, 94. Czech could not remember anything Tapling told him about Burnette. *Id.* at 102-03. Reilly became the manager in mid-September 1997. Reilly was promoted over Gadomski, who is also white and had significantly more experience in the department.

In fact, Tapling did not conduct any interviews for the 1997 promotion. Def. Ex. 2, Tapling decl. at ¶ 76. Tapling claims she did not have time. *Id.* Tapling testified that she is positive that Czech did not tell her to interview the candidates and that Czech did not put a great deal of weight on interviews in filling the 1997 position. Pl. Ex. H, Tapling dep. at 190-91. Tapling interviewed most of the personnel specialists less than two years earlier for the 1995 Brown vacancy. Def. Ex. 2, Tapling decl. at ¶ 76. Reilly was not a personnel specialist in 1995, and was not interviewed. Def. Ex. 22, Reilly decl. at ¶ 5. According to Tapling, interviews are unnecessary when candidates' performances are observed daily on the job. Pl. Ex. H, Tapling. dep. at 76.

After Tapling announced Reilly's promotion in mid-September 1997, Allen and Burnette immediately believed they had been discriminated against and went to the affirmative action unit to file an internal complaint. The internal complaint was referred to Billingslea, a CTA equal employment officer. Among those interviewed regarding Allen and Burnette's internal complaint were Allen, Burnette, Czech and Tapling. After completing her investigation, Billingslea submitted a written report to Kendricks, the affirmative action manager, who agreed with the report and said he would pass it on to Beavers, general manager of the equal employment department. Pl. Ex. M, Billingslea decl. at ¶ 8. Beavers did not receive the report. Def. Ex. 38, Beavers decl. at ¶¶ 7-8. Allen and Burnette contend the report concludes they were victims of discrimination. Pl. Resp. Br. at 12. However, the equal employment department never reached an official conclusion regarding their internal complaint. Def. Ex. 38, Beavers decl. at ¶ 8.

In early October, Allen and Burnette retained counsel. While the affirmative action unit investigated their internal complaint, their counsel filed charges with the Equal Employment

Opportunity Commission ("EEOC") and the Illinois Department of Human Rights ("IDHR") in late October 1997. The IDHR investigated and in August 1998 dismissed the charges for lack of substantial evidence. The EEOC concurred and issued right-to-sue letters in May 1999. Allen, Burnette and the CTA entered a series of tolling agreements, extending the limitations period for Title VII to November 23, 1999. Allen and Burnette filed this case on that date, claiming they were discriminated against in 1995 and 1997 for the manager positions in the employment and placement section.

## B. Analysis

### The 1995 Promotion Claim Is Time-Barred

Under Title VII, Allen and Burnette's right to sue in this court depends first on filing a timely charge of discrimination with the EEOC. 42 U.S.C. § 2000e-5(e)(1), (f)(1). They were required to file their charge within 300 days of the alleged discrimination. *Filipovic v. K & R Exp. Sys., Inc.*, 176 F.3d 390, 396 (7th Cir.1999). The 300-day period begins on the date Allen and Burnette knew or should have known with the exercise of reasonable diligence of the allegedly discriminatory actions. *Delaware State Coll. v. Ricks*, 449 U.S. 250, 256-57 (1980); *Jones v. Merchants Nat'l Bank & Trust Co.*, 42 F.3d 1054, 1058 (7th Cir. 1994); *Moskowitz v. Trustees of Perdue Univ.*, 5 F.3d 279, 281-82 (7th Cir.1993). The CTA did not waive the 300-day limitation. That date would fall in December 1996 because Allen and Burnette did not file their EEOC and IDHR charges until October 1997.

Allen and Burnette argue that their 1995 promotion claim is not time-barred based on the continuing violation theory and equitable tolling. To succeed on the continuing violation theory, Allen and Burnette must demonstrate that the CTA's promotion decisions were closely related. *Selan v. Kiley*, 969 F.2d 560, 565 (7th Cir. 1992). To establish the CTA's promotion decisions in 1995 and 1997 were closely related, the "subject matter" alleged to be discriminatory must be similar and involve the same type of discrimination. *Id.* Allen and Burnette claim the 1995 and 1997 promotion decisions constitute race discrimination under similar circumstances. The frequency of the CTA's alleged discriminatory conduct is also a factor; the more frequent the conduct, the more likely it is continuous. *Id.* The conduct Allen and Burnette consider discriminatory occurred twice: in 1995 when the promotion went to Lebron, and in 1997 when the promotion went to Reilly. Finally, the "degree of permanence" of the challenged promotion decisions must be considered. *Id.* Promotion decisions are discrete and permanent actions that should have caused Allen and Burnette to sue separately, rather than to await

repetition of the decision nearly two years later. *Jones*, 42 F.3d at 1058; *Nair v. Bank of Am. Ill.*, 991 F. Supp. 940, 957-58 (N.D. Ill. 1997); *Lacy v. Ameritech Mobile Communications*, 965 F. Supp. 1056, 1065-66 (N.D. Ill. 1997).

A continuing violation did not occur if Allen and Burnette knew or with the exercise of reasonable diligence should have known after each promotion that it was discriminatory. *Jones*, 42 F.3d at 1058; *Moskowitz*, 5 F.3d at 282. It is undisputed that Allen and Burnette knew they did not receive the March 1995 promotion soon after it was announced. Allen argues (and the CTA admits) that she could not have known that the 1995 promotion was discriminatory because she never perceived racism or other discrimination directed toward her in her nine years at the CTA and had no reason to believe that the decision was racially motivated. Pl. Ex. I, Allen decl. at ¶¶ 28-29; CTA Facts at ¶ 19. Burnette also argues (and the CTA admits) that she could not have know that the 1995 promotion was discriminatory because, although she disagreed with it, she did not believe she was the victim of discrimination. Burnette had no reason to attribute the decision to racism having never perceived racism directed toward her in her eight years at the CTA. CTA Facts at ¶ 20. Despite Allen and Burnette's contemporaneous beliefs they were not victims of discrimination because of the 1995 promotion decision, each had a basis that with reasonable diligence should have led them to suspect the decision was discriminatory. Even before 1995, Allen believed she was the victim of discrimination. Def. Ex. 6, Allen dep. at 85-86. Allen believed her salary was set at the minimum because of her race. *Id.* She believed since she began working there was a pattern whereby "African-Americans are put at th[e] minimum and non-African-Americans are put at a higher range." *Id.* at 87. With regard to the 1995 promotion, Allen testified that in February 1995, Tapling offered Allen the manager position. *Id.* at 212-13. Allen asserts she accepted the position. *Id.* In spite of Tapling's offer, in early March 1995, Tapling announced that Lebron, a non-African-American, received the manager position. *Id.* at 211. This alone should have put Allen on notice that the 1995 promotion might be discriminatory. But there was more. When the 1995 decision was made, Allen believed her performance was superior to Lebron's. *Id.* at 218. Allen believed she was more qualified for the promotion and that it was given to a less qualified non-African-American. *Id.* Allen's present self-serving statement that she had no reason to believe in 1995 that the decision to promote Lebron was discriminatory is unreasonable in view of her own deposition testimony about her earlier perceptions of racial discrimination at the CTA.

Burnette also believed in 1995 that she was more qualified for the promotion given to Lebron. Def. Ex. 7, Burnette dep. at 125-30. Burnette believed Lebron's work performance was poor, that he did not do his share of work, and that he was unprofessional. *Id.* Burnette had purported information when the 1995 promotion decision was made that through the exercise of reasonable diligence suggested the decision might be discriminatory. Like Allen, Burnette's professed belief she had no reason to suspect the 1995 promotion was discriminatory is unreasonable and contrary to the record. In sum, the continuing violation theory is unavailable to Allen and Burnette.

The equitable tolling argument fails for the same reason. Allen and Burnette were not required to sue the CTA for the 1995 promotion until they knew or should have known through the exercise of reasonable diligence that they were discriminated against. *Jones v. R.R. Donnelley & Sons*, No. 96 C 7717, 1999 WL 639180, at *2 (N.D. Ill. Aug. 17, 1999). Their own testimony suggests they each had a basis to suspect that the promotion was discriminatory when the decision was announced in 1995. Both believed at the time that they were more qualified for the promotion than the non-African-American candidate selected. *Jackson v. Rockford Hous. Auth.*, 213 F.3d 389, 396 (7th Cir. 2000). Neither can pursue a Title VII claim with regard to the 1995 promotion. *Jackson*, 213 F.3d at 396; *Moskowitz*, 5 F.3d at 282; *Smith v. Allstate Ins. Corp.*, 24 F. Supp.2d 870, 874 (N.D. Ill. 1998).

**The 1997 Promotion Claim**

To succeed on their claims based on the 1997 promotion, Allen and Burnette must present either direct evidence that they were discriminated against or proceed under the indirect method set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-805 (1973). They do not proffer direct evidence of discrimination, and thus must proceed under the indirect, burden-shifting method. In order to establish a *prima facie* case of race discrimination, they must show: they belong to a racial minority; they applied and were qualified for a job for which the CTA was seeking applicants; that, despite their qualifications, they were rejected; and the position was given to someone of a different race who had similar or lesser qualifications. *Perdomo*, 67 F.3d at 144. To satisfy the application requirement where jobs are unposted, each must show they would have applied if the jobs were posted. *Jaffe v. Johnson*, No. 86 C 7818, 1988 WL 37694, at *5 (N.D. Ill. Apr. 19, 1988); *Rogers v. Peninsular Steel Co.*, 542 F.Supp. 1215, 1220 (N.D. Ohio 1982), *cited in Box v. A & P Tea Co.*, 773 F.2d 1372, 1376 (7th Cir. 1985).

Once a *prima facie* case is established, the burden of production shifts to the CTA to articulate a legitimate, nondiscriminatory reason for its actions. *Courtney v. Biosound, Inc.*, 42 F.3d 414, 418 (7th Cir.1994). If the CTA does so, it has satisfied its burden and Allen and Burnette must then establish that the CTA's reason was pretextual. *Id.* In order to survive summary judgment, they must show a reasonable fact finder could infer that the CTA did not honestly believe the reasons for the promotion decision. *Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1124 (7th Cir.1994).

### 1. The *prima facie* case

The only element of the *prima facie* case the CTA asserts Allen and Burnette cannot establish is that Reilly was less qualified. The CTA points to Reilly's human resources certification and master's degree, two credentials Allen and Burnette lacked. The CTA misstates the standard. Allen and Burnette need only show that the 1997 promotion was given to someone of a different race who had *similar* qualifications. *Perdomo*, 67 F.3d at 144. Czech acknowledged that manager positions require only a bachelor's degree or, with no degree, a combination of education and work experience. Pl. Ex. K, Czech dep. at 23-25. The job description requires a candidate to "possess a bachelor's degree in business, personnel administration, or a combination of education and experience relating to this position." Def. Ex. 2A. Allen had a bachelor's degree in business administration and over seven years experience as a CTA personnel specialist. Def. Ex. 8. Burnette had a bachelor's degree in personnel management and over ten years experience as a CTA personnel specialist. Def. Ex. 17. In addition, Burnette had two years and eight months of personnel experience before she was employed by the CTA. *Id.* Therefore, Allen and Burnette's education and experience qualified them for the manager position and they have presented a *prima facie* case.

### 2. Legitimate, nondiscriminatory reasons for Reilly's promotion and pretext

The CTA offers legitimate, nondiscriminatory reasons for its decision to promote Reilly. Tapling evaluated the qualifications of the candidates. None was racial. Allen and Burnette must show that a reasonable fact finder could infer that the CTA did not honestly believe the reasons for its decision to promote Reilly. Allen and Burnette argue that the CTA's reasons for promoting Reilly are pretextual because the decision-makers, Czech and Tapling, directly contradict each other and there is strong evidence that the CTA fabricated the reasons for Reilly's promotion.

It is undisputed Czech had the authority to make the 1997 promotion, that Tapling recommended Reilly for the promotion, and that Czech concurred with Tapling's recommendation. According to Czech, interviews were important criteria in the 1997 promotion decision. Czech told Tapling not to make a recommendation without interviewing the candidates and reporting back to him. Despite this, Tapling did not conduct interviews. Czech relied on his understanding from Tapling that Reilly did well in his interview, but Allen did not in hers. Czech selected Reilly based on the interviews and the candidates' records.

Except for Reilly, Tapling actually interviewed the personnel specialists less than two years earlier for the 1995 vacancy. Tapling considered her daily work observations of the candidates a functional substitute for interviews. The CTA argues that whether or not formal interviews occurred in 1997 is a procedural matter that had no substantive impact on the outcome of Tapling's recommendation. According to the CTA, Czech and Tapling's conflict over the necessity or fact of formal interviews is not a material factual dispute precluding summary judgment. The court agrees. Tapling considered her daily interactions with the candidates as part of the selection process and as a functional equivalent of a formal interview. Her failure to reinterview Allen and Burnette a second time, and Reilly at all, cannot reasonably support an inference that her recommendation of Reilly was based on race.

Allen and Burnette argue Czech focused exclusively on maintaining institutional continuity and interviews as criteria for the 1997 promotion, but the criteria Tapling used emphasize other matters. Czech did not limit his decision to these criteria. Tapling discussed her matrix (premised on her notes) with Czech. Czech considered candidates' records as an important factor.

Allen and Burnette argue that Tapling used impermissible subjective criteria to make her recommendation. Subjective criteria do not show pretext. *See Scott v. Parkview Mem'l Hosp.*, 175 F.3d 523, 525 (7th Cir. 1999); *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 985 (7th Cir. 1999); *Vitug v. Multistate Tax Comm'n*, 88 F.3d 506, 515 (7th Cir. 1996).

It is unreasonable to conclude Tapling's testimony that personnel specialists were not required to learn to back-up the identification system discredits her. Pl. Ex. H, Tapling dep. at 49. The evidence shows that a working knowledge of the identification system was a prerequisite for the 1997 promotion, and that each personnel specialist Tapling considered had adequate skill in this area. There

is no evidence that Tapling did not honestly believe Reilly's performance in this area demonstrated his initiative.

Finally, Tapling considered institutional continuity in her decision to recommend Reilly. Although Reilly had only been in the employment and placement section for two years, Tapling considered his broad knowledge and diverse CTA experience an advantage because he knew who to contact in different departments to get things done. Pl. Ex. H, Tapling dep. at 219-20; Def. Ex. 2, Tapling decl. at ¶ 93. Tapling considered Reilly's lesser seniority to be outweighed by his other positive attributes. CTA Facts at ¶ 203. Tapling's notes and matrix show that Allen and Burnette's experience and job histories were considered. Allen and Burnette have not presented evidence that would support a reasonable inference that Tapling and Czech did not honestly believe that Reilly's qualifications outweighed their seniority. Further, Allen and Burnette were not the only candidates senior to Reilly who were passed over for the 1997 promotion. Gadomski, who is white and had more seniority than Reilly, was also passed over. Tapling and Czech's decision regarding Reilly's qualifications outweighing his seniority does not demonstrate pretext. *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000); *O'Connor v. DePaul Univ.*, 123 F.3d 665, 670-71 (7th Cir. 1997).

Allen and Burnette next argue that there is overwhelming evidence Tapling's reasons for selecting Reilly are fabricated. They offer: Tapling's view that Reilly showed initiative by working long hours, while time records show Allen and Burnette put in more time; Tapling told Billingslea and IDHR that Allen was denied the promotion for attendance reasons, but in her deposition she insisted attendance was not a factor; and Tapling cited Burnette's long distance telephone calls as a reason Burnette did not get the job, but this reason was not included on her matrix to Czech; a worse offender, Gadomski, was promoted.

As evidence that Reilly did not work late, Allen and Burnette point to the CTA's sign-in and yearly attendance sheets. Employees sign themselves in and out for actual time worked. Pl. Ex. K, Czech dep. at 44; Pl. Ex. L, Lebron dep. at 77-78. However, Lebron signed out his employees on a number of occasions, and generally wrote 4:30 p.m. as the sign-out time because that was "quitting time." Pl. Ex. L, Lebron dep. at 77-81. Tapling testified that it was common practice for managers to fill out employees' sign-out time as 4:30 p.m. because it was assumed employees work until at least 4:30 p.m. Pl. Ex. H, Tapling dep at 39. Allen and Burnette state that the sign-in sheets for the

27

personnel department between late November 1996 and late January 1997 do not reflect that Reilly worked past 5:15 p.m. (except on three occasions when he came to work later than his normal starting time), and they do not show that Reilly worked any Saturday. Pl. Ex. P. The attendance sheets for 1996 to 1997 do not show Reilly worked any Saturday. Pl. Ex. Q. Allen and Burnette argue that the sign-in sheets show, however, that during the four weeks Burnette worked between late November 1996 to late January 1997, she exceeded Reilly's hours each week. Pl. Ex. P. During the nine weeks Allen worked, there was no marked difference between herself and Reilly. She exceeded Reilly during five weeks, tied him two weeks, and was behind by three and a half total hours the remaining two weeks. *Id.* Allen and Burnette do not explain their selection of only certain weeks between late November 1996 to late January 1997.

There is no entry for Saturday time on the time sheet forms. Pl. Ex. P. Sign-in sheets were not used to track actual hours worked because personnel specialists are professionals, not hourly employees, and are not compensated for extra hours. Pl. Ex. H, Tapling dep. at 37. Tapling knew Reilly worked late because she saw him still in the office when she left around 5:30 or 6:00 p.m. *Id.* at 213-14. During the period from December 1996 to January 1997, Tapling estimated she saw Reilly working late sixteen times. *Id.* at 213. Tapling knew Reilly worked on Saturdays because she saw him. *Id.* at 214. Neither the sign-in sheets nor the yearly attendance sheets reflect Saturdays worked. Pl. Ex. L, Lebron dep. at 135-36. There is insufficient evidence to support a reasonable inference that Tapling did not honestly believe that Reilly was willing to work late and on Saturdays.

Allen argues that she worked extra hours and deserves special credit because she was also working on her bachelor's degree and raising a child. Pl. Ex. I, Allen decl. at ¶ 5. After Allen's second child was born in March 1996, her starting time was changed from 8:00 to 7:30 a.m; she voluntarily came in early. *Id.* at ¶ 23. However, from January to March 1996, Allen worked only five hour days. Pl. Ex. Q. Tapling acknowledged Allen came in about a half-hour early every day, but that she participated in flex-time scheduling so she could leave at 4:00 p.m. to pick up her children. Pl. Ex. H, Tapling dep. at 217-18. Tapling did not consider this demonstrated initiative. *Id.* Tapling did not believe Allen put in significant extra time in 1996 through 1997. *Id.* at 216. The record fails to show otherwise.

Burnette attests she worked extra unreimbursed hours by frequently coming into the office a half-hour to an hour early. Def. Ex. J, Burnette decl. at ¶¶ 5-7. Burnette claims she postponed foot surgery from early 1996 to late December 1996 so she could learn the new identification system. *Id.* at ¶ 11. Tapling had no recollection that Burnette told her she delayed foot surgery to be available to learn the identification system. Pl. Ex. H, Tapling dep. at 385-86. Tapling recalls Burnette was off work during a portion of the implementation of the identification system. *Id.* Tapling's handwritten notes and matrix do not reflect that Burnette worked extra unreimbursed hours, or rescheduled surgery. Def. Ex. 2F, 2I. Instead, Tapling's notes show she believed Burnette only worked eight hours and no more, and demonstrated a "union mentality" toward her work. Def. Ex. 2F. As an example, Tapling testified that when Burnette was assigned to work on photo identification at an outside location, she finished early enough to return to the office but wanted to go home instead. Pl. Ex. H, Tapling dep. at 227. Burnette offers two excuses. First, several days prior to the incident, Burnette worked at an outside location implementing the identification system. Pl. Ex. J, Burnette decl. at ¶ 12. When her work was completed in the early afternoon, Tapling told her to go home early because of lengthy travel time back to the office. *Id.* Second, Burnette states that it is a past practice in the personnel department that when specialists worked in the field, they frequently were not required to return to the office. *Id.* Lebron denied there was such a practice in the personnel department. Pl. Ex. L, Lebron dep. at 102-06. Burnette offers no evidence of a past practice other than her own statement. Burnette's excuses do not show that Tapling did not honestly believe that Burnette lacked initiative.

As evidence of pretext, Allen and Burnette point out that Tapling told Billingslea and the IDHR that Allen was denied the 1997 promotion for attendance reasons, but in Tapling's deposition she insisted attendance was not a factor. Tapling *did* consider attendance a negative factor in Allen's bid for the 1997 promotion. Her 1997 notes and matrix both list Allen's attendance as a weakness. Def. Ex. 2C, 2I. Tapling testified at the first session of her deposition (while reviewing her 1997 notes and matrix) that it was not the time involved that bothered her about Allen's absences, it was Allen's failure to file a claim form. Pl. Ex. H, Tapling dep. at 231-32. Tapling confirmed in her first deposition that Allen's absences in excess of family leave time were not a determining factor in the 1997 promotion decision. *Id.* at 297-98. However, after reviewing documents at her second deposition, Tapling testified she was no longer confident in her earlier statement; one of her concerns about Allen was her

absences in excess of family leave time. *Id.* at 349-60, 365-66. Allen and Burnette argue this is an afterthought to suggest unprotected absences were considered in the promotion decision. They assert that the only new documents Tapling reviewed at her second deposition were created after the 1997 promotion decision, including a Lebron memorandum concerning Allen's 52 absences for illness. Because these documents apparently were created after the promotion decision, Allen and Burnette suggest they are after-the-fact justifications for discriminatory promotion, and Tapling's reliance on them to refresh her recollection is disingenuous. This is especially so, Allen and Burnette argue, because Tapling could not remember whether she told Billingslea during her investigation that absences were a reason for not promoting Allen. However, according to Billingslea's summary, Tapling stated that one of Allen's weaknesses and reasons she was not promoted in 1997 was that Allen had 52 absences. Pl. Ex. M, Billingslea summ. of compl. at 4. The IDHR report also reflects that Tapling stated one reason Allen did not receive the 1997 manager position was that Allen had absences in excess of family leave time. Def. Ex. 31, 32, IDHR report at 4. By January 1996, Allen had exhausted all of her family leave. Pl. Ex. H, Tapling dep. at 330, 349-60. Tapling's 1997 notes and matrix include attendance as one of Allen's negative factors. Def. Ex. 2C, 2I.

The record clearly establishes that Tapling considered Allen's attendance a negative factor in her decision not to promote Allen. Allen and Burnette argue the change in Tapling's testimony between deposition sessions supports an inference that Tapling fabricated her reasons for not recommending Allen. Reasonable inferences must be grounded on more than speculation. *Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1146 (7th Cir. 1994). To determine whether an issue of material fact exists concerning Tapling's testimony, the court considers her original testimony and any later changes. *Havey v. Tenneco, Inc.*, No. 98 C 7137, 2000 WL 198445, at *2 (N.D. Ill. Feb. 11, 2000). A comparison of Tapling's two deposition transcripts does not support a reasonable inference Tapling fabricated her explanation for the reasons Allen's attendance was considered a negative factor.

Burnette's long-distance telephone calls (cited by Tapling as a reason for not promoting Burnette) are claimed evidence of pretext because a worse offender, Gadomski, was promoted. It is argued that Tapling's failure to include telephone abuse in her matrix shows pretext. Burnette used CTA telephones to make $141 worth of personal long-distance calls. Tapling considered this poor judgment and one of the reasons Burnette was not promoted. Pl. Ex. H, Tapling dep. at 379.

Burnette's telephone misuse was included in Tapling's notes, but not in the matrix. Def. Ex. 2F, 2I. Burnette reimbursed the CTA, and was verbally cautioned. Pl. Ex. H, Tapling dep. at 207. Similarly, Gadomski, a white personnel specialist, made personal calls amounting to $190. He was cautioned and required to reimburse the CTA. *Id.* at 207, 379. However, at about the same time Burnette was passed over for the 1997 manager promotion, Gadomski was promoted to senior personnel specialist. *Id.* at 381. Gadomski was passed over for the 1997 manager promotion in part because of his telephone misuse. *Id.* 379. Tapling explained that Gadomski was promoted to senior personnel specialist because "he was [already] doing the full exempt postings as all the other seniors were. So he was doing the work of a senior [personnel specialist] at the lower level." *Id.* at 382.

Gadomski's promotion to senior personnel specialist is immaterial. Burnette and Gadomski suffered the same consequence for their telephone abuses. It was considered a negative factor in both their bids for the 1997 manager promotion. There is no genuine issue of material fact concerning whether Tapling honestly believed Burnette showed poor judgment in making personal long-distance calls on CTA telephones. Further, there is no evidence Tapling discriminated in her consideration of telephone misuse in the 1997 manager promotion.

Tapling's notes indicate additional reasons she did not recommend Allen and Burnette. Def. Ex. 2C, 2F. Allen and Burnette do not contend these reasons are evidence of pretext.

Tapling had concerns about Allen's maturity. Allen's immaturity manifested itself in her conflict with a co-worker from another department, and Allen's tendency to refuse to talk to co-workers. Def. Ex. 2C; Def. Ex. 32, IDHR report at 3; Pl. Ex. H, Tapling dep. at 202-05; Def. Ex. 2, Tapling decl. at ¶¶ 32, 79, 81-82. Tapling was concerned about Allen's ability to handle confrontational issues as a manager because of her reaction to an argument with a manager, Michael Planthaber on a Friday afternoon. Pl. Ex. H, Tapling dep. at 202-05. Allen was tearful and appeared upset that Friday and was still visibly upset on Monday. *Id.* Tapling considered Allen's reaction to be disproportionate to the occurrence. *Id.* In Tapling's view, a manager must be able to assert herself and have tougher skin. *Id.* Allen testified that Planthaber screamed at her for no reason. Def. Ex. 6, Allen dep. at 295-98. Lebron was present and allowed Planthaber to scream at her. *Id.* After Planthaber left, Allen called Planthaber's boss to discuss Planthaber's unprofessional behavior. *Id.* Allen filed a complaint that Tapling resolved. *Id.* at 301-02. Tapling did not meet with Allen and Planthaber or Planthaber's

supervisor to resolve the issue. *Id.* Tapling spoke with Planthaber's supervisor to resolve the issue. Pl. Ex. H, Tapling dep. at 204-05. Ultimately, Allen's justification for being upset does not create an issue of material fact that Tapling did not honestly believe the incident demonstrated Allen's immaturity.

According to Tapling, Burnette exercised poor judgment when she was absent for illness for two and a half weeks without submitting a claim form from her doctor. Pl. Ex. H, Tapling dep. at 372-75. Tapling considered this in her decision not to recommend Burnette for the 1997 promotion. *Id.* Burnette was not disciplined for the delay in turning in her doctor's claim form. Pl. Ex. J, Burnette decl. at ¶ 16, but she did lose several days pay. Pl. Ex. H, Tapling dep. at 375-76. Burnette "explained" her failure to comply with the CTA's absentee procedures by stating she contacted her doctor for severe back pain before she left the office and was informed to take aspirin. The pain continued for five days, but when Burnette called to make an appointment with her doctor, he was on vacation. Pl. Ex. M, Billingslea's summ. of compl. at 6. Burnette waited for her doctor to return to make an appointment. *Id.* This simply does not explain why Burnette did not submit a claim form. Burnette offers no evidence that Tapling did not believe Burnette failed to file a claim form for an extended absence and that this showed poor judgment for a prospective personnel manager.

There is no genuine issue of material fact regarding Tapling's assessment of the candidates for the 1997 manager promotion. The CTA has shown legitimate, non-discriminatory reasons for the decision to promote Reilly. There is no issue of material fact that the CTA's reasons were pretextual.

## III.   Earnest Leonard

### A.   Background

The CTA moves for summary judgment on Leonard's §§ 1981 and 1983 promotion and pay claims (Count II) and his Title VII retaliation claims (Count IV). Leonard improperly titles his promotion arguments with a Title VII heading. He improperly asserts a disparate impact theory, a Title VII denial of instruction claim and a hostile work environment claim for the first time in his response brief. Leonard cannot bring new claims at this late hour. *Auston v. Schubnell*, 116 F.3d 251, 255 (7th Cir. 1997).

Leonard was hired in 1991 as a bus operator. In February 1993, Leonard transferred to the reprographics department, which provides printing services to the entire CTA. Leonard is a duplicating machine operator. He is a union member, and has progressed from grade level two to four. Since

September 1997, the reprographics department has been managed by Joseph Mitria. Mitria is white. The department is organized into three groups: reprographics, copy center/finishing, and forms materials graphics. Leonard reports to the reprographics coordinator. Reprographics employees in the copy center/finishing group report to the copy center/finishing specialist.

### 1.    Failure to promote claims

Leonard's failure to promote claims concern the managerial positions of reprographics coordinator and copy center/finishing specialist, which he allegedly sought in September 1997, March 1998, fall 1999, and fall 2000.

The September 1997 promotion involves the reprographics department manager position that Mitria received. Leonard applied and was rejected for this position. Noelle Gaffney, vice president of communications, was responsible for selecting the manager. Leonard and Geraldo Urbano, both with more experience in reprographics than Mitria, were rejected. Gaffney considered CTA budgeting, purchasing, and managerial experience. Experience in the printing field was not important. Gaffney concluded Mitria was best qualified because he had the desired qualifications, and filled in for the department's former-manager.

Just after Mitria became reprographics department manager, Leonard contends Mitria told him the mayor was responsible for job selections on a non-merit basis. Leonard Facts at ¶ 8. Vernita Caver, an African-American, attests Mitria made a similar comment to her, and that Mitria named three African-Americans he considered less qualified who passed him over during the administration of a former African-American mayor. Pl. Ex. 46, Caver aff. at ¶ 3. Leonard, Caver and Michael Andrich, a white co-worker, claim Mitria excluded African-Americans from meetings. Leonard Facts at ¶ 9; Pl. Ex. 46, Caver aff. at ¶ 4; Pl. Ex. 39, Andrich aff. at ¶ 2. Leonard complains he did not receive the copy center/finishing specialist position in March 1998. He did not apply. The vacancy was posted, and assigned to an African-American personnel specialist, who reviewed resumes and forwarded them to Mitria. Mitria selected Awilda Zanin, who is Hispanic, based in part on her experience. Leonard contends Zanin had less experience than he. In fall 1999, Leonard applied and was rejected for the position of reprographics coordinator in favor of a non-African-American external candidate, Cipriano Lazoya. Finally, Leonard was prevented from applying for the fall 2000 promotion to reprographics coordinator, and claims he should have received the position.

## 2. Retaliation claims

Leonard is a chronic complainer. He lodged numerous complaints against CTA supervisors and co-workers prior to Mitria's arrival in 1997. Def. Ex. 29, 30, 31, 33. Leonard's performance was an issue prior to Mitria becoming his manager. Def. Ex. 4, Caswick dep. at 16-21; Def. Ex. 32. During Mitria's first week as manager, Leonard informed Mitria that he should be upgraded from a grade four to five because the department's grade five pressman retired, and Leonard was next in seniority. The grade five position was never filled. Mitria reviewed all job descriptions to determine how a reprographics employee could move up grade levels, and whether assignments outside a job description warrant higher pay. Def. Ex. 7, Mitria dep. at 256-259. Mitria requested a job study of Leonard's position, but Leonard refused to participate. Def. Ex. 7, Mitria dep. at 166., Def. Ex. 35, Def. Ex. 40; Leonard Resp. at ¶ 43. Nevertheless, Leonard complained to the CTA's affirmative action unit that Mitria did not upgrade him from level four to five. Def. Ex. 34, 37, 38, 43. Leonard asserted that two non-African-Americans were given upgrades. Leonard Resp. at ¶ 45. Leonard concedes that they were upgraded from grade two to three, so they remained junior to him. *Id.* at ¶ 46.

Leonard next complained to the affirmative action unit in December 1997 regarding the transfer of employees (most of whom were African-American) with greater seniority into the reprographics department. Def. Ex. 36. Leonard did not like this because he was next in line for an upgrade before they arrived. Def. Ex. 6, Leonard dep. at 200-05. The affirmative action unit determined Leonard's complaint was a union matter. Def. Ex. 36.

In February 1998, Zanin (before she was promoted to copy center/finishing specialist) complained to Mitria about an incident involving Leonard. Def. Ex. 39. Zanin reported that Leonard came into a room where she and other employees were working and stated he wanted to have a meeting. *Id.* Leonard loud and slammed his fist on a table. *Id.* Because Zanin was upset by Leonard's behavior, Mitria asked witnesses for statements. Def. Ex. 7, Mitria dep. at 54-59. Mitria discussed the incident with Leonard, but did not discipline him. Def. Ex. 6, Leonard dep. at 239; Def. Ex. 7, Mitria dep. at 59.

Leonard sent letters complaining about Mitria to the affirmative action unit, his union, Mayor Richard M. Daley, CTA president Frank Kruesi and CTA vice president Gaffney. Def. Ex. 42-47.

Leonard issued a press release that appeared in the Chicago Defender editorial section. Def. Ex. 70, 72.

In August 1998, Gaffney became aware that an employee in another department was disciplined for violating CTA policy that required employees to complete a form on outside employment. Def. Ex. 5, Gaffney dep. at 43-45; Def. Ex. 49. Gaffney instructed managers who reported to her to ensure that all employees working outside jobs completed the form. Def. Ex. 5, Gaffney dep. at 43-45; Def. Ex. 7, Mitria dep. at 226; Def. Ex. 48. In response to Gaffney's instruction, Mitria asked Leonard to complete the form. Def. Ex.7, Mitria dep. at 220. Leonard attests that Mitria did not ask other employees to fill out the form. Pl. Ex. 51, Leonard aff. at ¶ 4. On his resume, Leonard is president of Earnest Leonard Body Building, Modeling, Ltd.; the "founder, organizer, and promoter of Chicago's largest body building competition;" and the "manage[r] and supervise[r] [of] staff of 23 in the year-round promotion of on-going competitions and fund-raisers under the auspices of ELBBM." Def. Ex. 28; Def. Ex. 5, Gaffney dep. at 44. Leonard refused to complete the form because he netted no income from his bodybuilding promotion efforts, and the form refers to compensated outside employment. Def. Ex. 6, Leonard dep. at 269; Def. Ex. 53; Def. Ex. 49. Mitria told Leonard to complete the form anyway. Def. Ex. 6, Leonard dep. at 269. Leonard refused again and filed an internal complaint with the affirmative action unit. Def. Ex. 52. In response to Leonard's complaint that he was singled-out, Mitria sent a memorandum to all department employees about the outside employment policy. Def. Ex. 7, Mitria dep. at 98-99; Def. Ex. 51. The affirmative action unit investigated Leonard's complaint and found it to be without cause. Def. Ex. 55. Leonard later testified that there is no Earnest Leonard Body Building, Modeling, Ltd., and he was never the president of any business, attributing his resume to "flamboyan[ce]." Def. Ex. 6, Leonard dep. at 99-102.

In January 1999, a level seven employee in the reprographics darkroom was on vacation for two days. Pl. Ex. 56. Lazoya attests that Mitria instructed him to place Andrich and Gary Gean, who both are white, in the darkroom. Pl. Ex. 21, Lazoya aff. at ¶ 10. Andrich received level seven pay for two days, and Gean for one day. Pl. Ex. 56. Leonard asked who made the decision to put Andrich and Gean in the darkroom; Lazoya responded that Mitria did. Pl. Ex. 21, Lazoya aff. at ¶ 10. Lazoya informed Mitria about Leonard's question; Mitria remarked, "we'll get a grievance. Leonard has all this experience, but he doesn't know a thing. Expect it." *Id.* Over a year later, in March 2000, Leonard

contends that Mitria asked Gean, who had less seniority, to be trained in the darkroom. Leonard Facts at ¶ 36. Leonard filed a grievance arguing he should have been asked because he had more seniority and requested "to be made financially whole, [because he is] consistently losing money with this illegal ongoing practice." Pl. Ex. 57.

Another incident occurred in March 1999, when Leonard was temporarily assigned to work as a level seven duplicating machine operator and received level seven pay. Def. Ex. 7, Mitria dep. at 122, 124. Leonard engaged in a loud, heated argument with Urbano, who was permanently assigned to a press in the same room. Def. Ex. 7, Mitria dep. at 122, 124; Def. Ex. 67. Mitria sent them both home for the day. *Id.* Mitria spoke to witnesses and gave Urbano and Leonard written cautions. Def. Ex. 7, Mitria dep. at 264-266; Def. Ex. 57. Based on this event, and events prior to his arrival, Mitria did not believe Urbano and Leonard would be able to get along if they continued to work in close proximity. Def. Ex. 7, Mitria dep. at 181-82; Def. Ex. 67. Mitria decided to separate the two by moving Leonard to his regular press where he resumed level four pay. Def. Ex. 7, Mitria dep. at 181-82; Leonard Resp. at ¶ 68. Leonard protested his return to his regular assignment by writing to Mayor Daley again, Def. Ex. 60; by writing to CTA president Kruesi, Def. Ex. 59; by filing his first discrimination charge with IDHR, alleging he was demoted as a result of the argument, Def. Ex. 61; by filing a charge with the Chicago Commission on Human Relations, Def. Ex. 66; and by filing a grievance with his union. Def. Ex. 63, 64.

Later that same month, Leonard was again disciplined for misconduct -- this time for leaving work for nearly five hours without informing anyone of the length of time he would be gone. Def. Ex. 62. Leonard received a written warning, but he suffered no loss in pay or work time. *Id.*

In August 1999, Leonard filed a grievance complaining that two white employees at lower grade levels were assigned by Mitria to a "grade 7 press" for five days. Pl. Ex. 54. Leonard wrote that he "has been complaining constantly about the blatant disrespect by . . . Mitria for union guidelines and employees. [Leonard claims to have] . . . more seniority than the other two employees, and yet [he] was never asked to run the grade seven jobs." *Id.*

In late 1999, Leonard, who is a bodybuilder, was instructed in writing to remove his weights and barbells from the floor around his printing press. Def. Ex. 73. Leonard was not disciplined, yet he promptly filed an IDHR charge alleging the written instruction to remove his weights was retaliatory.

Def. Ex. 74; Leonard Resp. at ¶ 80. Notably, Leonard did not allege that Mitria's conduct was race-based. Def. Ex. 74.

In January 2000, Leonard wrote to Zanin requesting that paper be cut for a printing job. Def. Ex. 6, Leonard dep. at 594; Def. Ex. 75; Pl. Ex. 43. Zanin told Leonard to cut the paper himself because the paper-cutter was off. Pl. Ex. 43. Leonard asked if he would be paid at the higher rate the paper-cutter receives. Def. Ex. 6, Leonard dep. at 594-95; Pl. Ex. 43. Leonard called his union representative, Juan Mercado, to find out if he should be paid the higher rate. *Id.* Meanwhile, Zanin gave Leonard's note to Mitria. Pl. Ex. 43. Mitria, through Zanin, instructed Leonard to cut the paper himself. Def. Ex. 75; Pl. Ex. 43. Leonard spoke to Mercado about the job. Def. Ex. 6, Leonard dep. at 595-96. Mercado discussed the situation with Mitria. Def. Ex. 75; Pl. Ex. 43. Mitria told Mercado that Leonard refused to perform a job. Pl. Ex. 47, Mercado aff. at ¶ 6. Mercado informed Mitria that he spoke to Leonard, and that Leonard contended he did not refuse to cut paper; rather, he would cut paper and then file a grievance. *Id.*

After Leonard spoke with Mercado, Leonard began cleaning the press machine. Def. Ex. 6, Leonard dep. at 597. While cleaning the press, a co-worker requested Leonard's help with a nearby machine and Leonard went to help. *Id.* at 598. Mitria came out of his office to speak to Leonard about the paper-cutting job and found Leonard helping a co-worker. *Id.* Leonard states that Mitria yelled at him. *Id.* Leonard became angry and yelled back. *Id.* at 598-604. Mitria told Leonard to go home. *Id.* at 601. Leonard refused to leave, and called Mercado again. Def. Ex. 6, Leonard dep. at 601-02; Pl. Ex. 46, Caver aff. at ¶ 5. Mitria was upset and yelled, "I want him out of here, I want him out of here." Def. Ex. 6, Leonard dep. at 602. Mitria contacted security to remove Leonard. Def. Ex. 6, Leonard dep. at 602; Def. Ex. 75. Mercado arrived, spoke with Leonard, and they left the reprographics department with security in pursuit. Def. Ex. 6, Leonard dep. at 603-04. Mitria suspended Leonard for two days. Def. Ex. 75; Leonard Resp. at ¶ 84. Leonard filed an IDHR charge the next day. Def. Ex. 77. He also filed a grievance contending the suspension was in retaliation for his grievances and IDHR charges. Def. Ex. 76, 78.

In June 2000, Lazoya was terminated. Leonard claims he did not apply for the reprographics coordinator position because a personnel department employee told him his two-day suspension in

January 2000 prevented him from applying for the position. Pl. Ex. 51, Leonard aff. at ¶ 9. The CTA admits Leonard was ineligible for consideration in part because of his suspension.

In August 2000, Mitria approached Leonard while he was running his press. Pl. Ex. 60; Def. Ex. 6, Leonard dep. at 712-19. Mitria yelled about Leonard defacing CTA property while pointing his finger in Leonard's face. *Id.* There was a poster on the wall near Leonard that had Mitria's face cut out of it. *Id.* Leonard claims Mitria said to him, "if I don't stop pointing my finger in your face, what are you going to do about it." *Id.* Andrich observed this incident and states that Mitria yelled and pointed his finger in Leonard's face, and Leonard told Mitria, "I have told you over 25 times not to stick your finger in my face." Pl. Ex. 39, Andrich aff. at ¶ 7. Andrich states Mitria responded, "what are you going to do if I don't stop." *Id.* Mitria denies he yelled or pointed his finger at Leonard. Def. Ex. 7, Mitria dep. at 350-54. Leonard filed a grievance. Pl. Ex. 60. There is no evidence that Leonard was disciplined for this incident.

In October 2000, Urbano began working as reprographics coordinator. This left two level seven positions open. Leonard claims these positions should be filled by reprographics employees senior to Leonard so that he can apply for one of their positions, or he should be able to move into one of the open level seven positions.

Also in October 2000, a doctor diagnosed Leonard with depression and an acute stress disorder. Pl. Ex. 64. On the same day, Leonard's attorney sent the CTA's attorneys a "cease and desist" request that Mitria discontinue his alleged "continued pattern of harassment of Leonard by yelling, screaming, cursing and pointing his finger in Leonard's face in an attempt to provoke Leonard into action that would cause Leonard to be disciplined." *Id.* A few days later, Leonard states Mitria ordered him to run a grade seven press for level four pay. Pl. Ex. 51, Leonard aff. at ¶ 18. Leonard filed a grievance complaining that "Mitria is clearly trying to change the [collective bargaining agreement] rules in the middle of the Ballgame [sic]." Pl. Ex. 65.

In late October 2000, Leonard was given another job he believed warranted more pay than his level four. Leonard filed a grievance claiming the work was sophisticated enough to require level seven pay. Pl. Ex. 66.

In October 2000, Leonard was suspended for five days, along with ten other individuals in the reprographics department, for falsifying overtime records. Def. Ex. 6, Leonard dep. at 770; Def. Ex.

98. Leonard filed a grievance opposing his discipline, arguing that logging more overtime than worked is a past practice. Def. Ex. 99; Leonard Resp. at ¶ 90.

In November 2000, Leonard was given a rush printing job. He contaminated the ink for the job, and worked so slowly that the job was given to an African-American co-worker, who was able to re-wash the presses and complete the job in a timely manner. Def. Ex. 101, Mitria aff. at ¶ 25. That same day, Leonard sent a letter to the affirmative action unit complaining of Mitria and Urbano's conduct in early November 2000. Leonard claims he received a memo from the affirmative action unit stating it could not address his concerns. Pl. Ex. 51, Leonard aff. at ¶ 19. Leonard does not offer the memo as an exhibit or the reasons why his concerns could not be addressed. Leonard sent a second letter claiming his complaints were not just grievances, but were also discrimination complaints. Pl. Ex. 68. Leonard never received a response. Pl. Ex. 51, Leonard aff. at ¶ 19.

In late November 2000, Urbano instructed Leonard to complete a printing job, and report to Zanin afterwards. Pl. Ex. 70-73. Leonard reported to Zanin as instructed, and informed Urbano the job was completed. *Id.* Urbano told Leonard the job was not finished. *Id.* According to Urbano, Leonard became insubordinate. Mitria was on vacation when this incident occurred. Pl. Ex. 51, Leonard aff. at ¶ 25. When Mitria returned, he asked Leonard to fill out a report about the incident. *Id.* Leonard reported that there "was no incident, but a discussion about work, and a printing job." Pl. Ex. 72. Mitria placed Leonard on twelve months probation.

Since August 1999, Leonard has filed a dozen or so grievances relating to various alleged retaliatory acts. He complained he was passed over for job assignments that carry a higher rate of pay. Def. Ex. 68, 79, 87, 91, 95. He complained he was passed over for overtime. Def. Ex. 88, 91, 94. He complained he was assigned work outside his job description. Def. Ex. 92. He complained he was paid at grade four rate for work that higher pay. Def. Ex. 97. In October 2000, Leonard filed an unfair labor practice charge with the Illinois Labor Relations Board covering many of the same events. Def. Ex. 96. As part of the union grievance process, Mitria has responded to many of Leonard's complaints. For example, Mitria has explained that Leonard has not been selected for some assignments because he was unqualified to perform them. Def. Ex. 71, 80, 90. Leonard disputes Mitria's responses. Def. Ex. 68, 79, 87. With respect to Leonard's overtime claims, Mitria has responded that overtime is assigned based upon manpower, workflow requirements and qualifications, before seniority is taken into account. Def.

Ex. 89. Leonard disputes these responses. Def. Ex. 88. But Leonard fails to explain why he did not pursue his grievances through the process established by the collective bargaining agreement.

African-American and non-African-American employees have complained about Mitria. Def. Ex. 83. Leonard has complained about Mitria's management of all employees, without respect to race. Def. Ex. 56.

## II.    Analysis

### Section 1981 and 1983 promotion claims

Leonard's promotion claims concern the managerial positions of reprographics coordinator and copy center/finishing specialist, which he allegedly sought in September 1997, March 1998, fall 1999, and fall 2000. To succeed on his promotion claims, Leonard must present either direct evidence that he was discriminated against or proceed under the *McDonnell Douglas* indirect method.

### Direct evidence of discrimination

Leonard asserts Mitria's statement in October 1997 that the present mayor (who is white) "wanted these jobs the same way former Mayor Harold Washington (who was African-American) wanted them" is direct evidence of discrimination. Similarly, he claims Mitria's statement that jobs [that Mitria] was qualified for were given to less educated, unqualified persons evidences racial *animus*. Caver attests Mitria made a similar comment to her in November or December 1997, and that the unqualified people Mitria referred to are all African-American. Pl. Ex. 46, Caver aff. at ¶ 3. Caver does not identify "these people," how she knows them, or what qualifications they possess. Leonard does not either. Def. Ex. 6, Leonard dep. at 180-84. Mitria denies he made the statements. Def. Ex. 7, Mitria dep. at 75-76. For purposes of this motion, it is assumed he did.

It is well-settled that stray, temporally distant remarks do not constitute direct evidence of discrimination. *Fuka v. Thompson Consumer Elec.*, 82 F.3d 1397, 1403 (7th Cir. 1996) (citing *McCarthy v. Kemper Life Ins. Co.*, 924 F.2d 683, 686-87 (7th Cir. 1991)). To be probative of direct discrimination, an isolated remark "must be contemporaneous with the discharge or causally related to the discharge making process." *Geier v. Medtronic, Inc.*, 99 F.3d 238, 242 (7th Cir. 1996); *Fortier v. American Mobile Communication, Inc.*, No. 97 C 0615, 1997 WL 769463, at * 5 (N.D. Ill. Dec. 9, 1997), *aff'd*, 161 F.3d 1106 (7th Cir. 1998).

40

The first failure to promote claim concerns the September 1997 reprographics department manager position. Gaffney was the undisputed decision-maker. As a result, Mitria's comment cannot constitute direct evidence for the September 1997 promotion. *Hunt v. City of Markham*, No. 99 C 1331, 2000 WL 968540, at *2 (7th Cir. July 11, 2000). Further, Leonard abandoned this claim by failing to address the September 1997 promotion in his response brief. He also abandoned the claim that he was discriminatorily denied the copy/center finishing specialist promotion in March 1998 by failing to address it in his response brief.

The reprographics coordinator position filled by Lazoya in fall 1999 occurred almost two years after Mitria's alleged mayoral comment. Two years is too remote to establish a causal link. *Geier*, 99 F.3d at 242; *Fortier*, No. 97 C 0615, 1997 WL 769463, at * 5; *Ress*, No. 97 C 5569, 2000 WL 28265, * at 8-9. Finally, Leonard has not alleged in the complaint or sought to amend it to include denial of a promotion in the fall of 2000. Mitria's remote comment is not direct evidence of discrimination with regard to this promotion either.

Leonard claims Mitria's alleged exclusion of African-Americans from meetings in 1997 is direct evidence of discrimination. Leonard provides no dates for the meetings; who attended; who was excluded; or how he knows the nature of the meetings if he was excluded. Nor does Leonard's deposition testimony support his assertion. Def. Ex. 6, Leonard dep. at 220-22. Caver and Andrich testified they "noticed that when Mitria became manager he excluded African-American employees from meetings that he had with white employees. In these meetings I understood that he was asking the white employees to take him through the process of certain jobs in the department." Pl. Ex. 46, Caver aff. at ¶ 4; Pl. Ex. 39, Andrich aff. at ¶ 2. Caver and Leonard had no personal knowledge about these meetings. Andrich provides no specifics regarding who was there or when meetings occurred. Mitria denies he ever excluded African-American employees from meetings. Def. Ex. 101, Mitria aff. at ¶ 2. In fact, Mitria states that when he became manager, he met with each employee including Leonard. *Id.* at ¶ 3. Whether or not Mitria excluded African-Americans from meetings, Leonard does not offer any evidence that his exclusion is related to any denied promotion. Thus, the vague and speculative evidence that Mitria excluded African-Americans from meetings does not constitute direct evidence of discrimination. *See Oest v. Illinois Dept. of Corr.*, 240 F.3d 605, 611 (7th Cir. 2001).

**The *prima facie* case and pretext**

Leonard has not presented any disputed issues of material fact to show that the CTA's non-discriminatory reasons for not promoting him were pretextual. Leonard argues the CTA "cannot raise any clear non-pretextual reasons for denying [his] promotions . . ." Resp. Br. at 13. This conclusion does not satisfy Leonard's burden to establish pretext. *Payne*, 146 F.3d at 433; *Perdomo*, 67 F.3d at 144.

**The Title VII Retaliation Claims**

The same legal standard with respect to the indirect method of proving discrimination under §§ 1981 and 1983 also applies to Title VII claims. Although it is difficult to surmise from Leonard's stream-of-consciousness argument on retaliation, unsupported by case or record citations, Leonard appears to base his retaliation claims on not being upgraded to level five when Mitria became manager; for being asked to remove his weights from his work area; by the transfer of employees into his department with greater seniority; for Mitria talking to Leonard about banging his fist on a table in front of other employees; for Mitria allegedly taking credit for the work of the reprographics department; for Leonard being asked to fill out an outside employment form; for being removed from a temporary grade seven assignment for a dispute Leonard had with a co-worker; for receiving a written warning for leaving work for five hours; for being suspended for not completing a paper-cutting job and then arguing with Mitria about it; for being suspended after Leonard admitted falsifying his overtime records; for being placed on twelve-months probation for insubordination; and various alleged denials of overtime opportunities and temporary assignments warranting higher pay.[7] Because most of these acts had no tangible consequence to Leonard, they do not constitute adverse job actions.

Leonard's failure to be upgraded from level four to five in September 1997 does not constitute retaliation for several reasons. First, this claim is time-barred. Leonard's claim regarding the September 1997 upgrade (which is not mentioned in his November 1999 IDHR and EEOC charges) is four months too late. Second, when Mitria became manager in September 1997, he reviewed all job descriptions to

---

[7] To the extent Leonard complains of other conduct by Mitria as retaliatory, Leonard has offered no evidence of pretext except his conclusion that "the statements made and actions taken by Mitria show a clear intent and motive to retaliate." Resp. Br. at 17. Without more, all Leonard's retaliation claims fail. *See Walker v. Glickman*, – F.3d –, No. 00 C 1978, 2001 WL 194510, at *3-4 (7th Cir. Feb. 27, 2001); *Sanchez v. Henderson*, 188 F.3d 740, 746 (7th Cir. 1999).

determine how a reprographics employee could move up grade levels. It is undisputed that Mitria requested a job study on Leonard's position, but Leonard refused to participate in a job study that might have increased his grade level. *See Reed v. Shepard*, 939 F.2d 484, 491 (7th Cir. 1991) (defendant cannot "be held liable for conditions created by [a plaintiff's] own action and conduct"). It is undisputed that the level five position remained unfilled and Leonard was aware as early as mid-October 1997 that the position would likely remain unfilled due to budget concerns. Leonard Resp. at ¶ 41; Def. Ex. 34, 38. Leonard proffers no evidence the denial of an upgrade was retaliatory. Nor could he because the decision not to fill the position pre-dates Leonard's complaints of discrimination. Def. Ex. 34, 38, 43. Moreover, Leonard offers no evidence that the CTA's reason for not filling the grade five position was pretextual.

The transfer of employees (mostly African-American) with greater seniority into the reprographics department does not constitute retaliation. Leonard did not like the transfer because he was next in line for an upgrade before they arrived. Def. Ex. 6, Leonard dep. at 200-05. However, there is no evidence Mitria authorized the transfer or that the transfer was discriminatory or retaliatory.

Leonard's removal from his temporary assignment to a level seven position for a dispute with a co-worker does not constitute retaliation. In late March 1999, Leonard was temporarily assigned to work as a level seven duplicating machine operator and received level seven pay. During this time, Leonard engaged in a loud, heated argument with Urbano, who was permanently assigned to a press in the same room. Based on this event, and events prior to Mitria's arrival, Mitria did not believe Urbano and Leonard could continue to work in close proximity. Mitria separated the two by moving Leonard back to his regular press where he resumed his regular level four pay. Mitria could not move Urbano because he was a permanent level seven pressman, assigned to a press in that room. Def. Ex. 7, Mitria dep. at 261. Leonard protested his return to his regular assignment but he does not dispute that he had an argument and a physical altercation with Urbano. Def. Ex. 59, 61, 63-64, 66. Leonard offers no evidence that Mitria's decision was discriminatory or retaliatory. Mitria gave both Leonard and Urbano written cautions and believed it was necessary to separate them. Leonard presents no evidence that Mitria did not honestly believe that Leonard and Urbano should be separated.

Mitria suspended Leonard for two days for a confrontation arising from Leonard's dilatory effort to complete a paper-cutting job. Leonard filed a grievance with his union contending the suspension was

in retaliation for his grievances and IDHR charges. Def. Ex. 76, 78; Pl. Ex. 46-48. Although these grievances contain statements by Leonard's co-workers and union representatives that they believe he suffered retaliation, their opinions do not support an inference of illegal retaliation. *Kyles v. JK Guardian Sec. Servs., Inc.*, No. 97 C 8311, 2000 WL 1810003, at *4 (N.D. Ill. Dec. 11, 2000); *see also Lee v. State of Minn.*, 157 F.3d 1130, 1135 (8th Cir. 1998); *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 512 (8th Cir. 1995). Leonard presents no competent evidence of how his grievances and IDHR charges are remotely related to his two-day suspension. Leonard cannot insulate himself from discipline for disrupting the workplace by contesting every CTA action. *Mora v. Chicago Tribune*, 57 F. Supp.2d 626, 638 (N.D. Ill. 1999) (citing *Bermudez v. TRC Holdings, Inc.*, 138 F.3d 1176, 1179 (7th Cir. 1998)); *see also Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc). Leonard offers no probative evidence that Mitria's reasons for suspending him for two days were pretextual.

Leonard boldly contends his suspension for falsifying overtime records was retaliatory. The CTA caught employees, including Leonard, who falsified overtime records. Def. Ex. 98; Leonard Resp. at ¶ 88. Leonard admits that he did this. Def. Ex. 6, Leonard dep. at 765-66; Leonard Resp. at ¶ 89. Yet he filed a grievance. Def. Ex. 99; Leonard Resp. at ¶ 90. He argued (without any factual basis) that logging more overtime than worked was a past practice. Def. Ex. 99. Leonard contends his suspension, though equal to the suspension of others, constituted retaliation by Mitria. Def. Ex. 6, Leonard dep. at 772. Leonard asserts Mitria suspended all violators for fraudulently logging unworked overtime to "disguise [Mitria's] previous retaliatory and discriminatory actions against Leonard." Leonard Resp. at ¶ 91; Def. Ex. 7, Leonard dep. at 772-777. Leonard offers nothing more than his irrational assertion to argue his clearly justified suspension was pretextual.

Leonard claims his twelve-month probation for the printing job incident in late November 2000 was retaliatory. Leonard now attempts to refute these events with his internally inconsistent affidavit, executed three months after the incident. Leonard now claims he completed the job (despite admitting he left the plate on the press, left the negatives out of their folder, likely did not log the number of sheets he completed, and ran out of yellow paper necessary to complete the job); that he did not raise his voice to Urbano (despite Zanin witnessing the incident); that Urbano never told him to complete the job (despite Zanin witnessing this); that he never commented that Urbano would require an ambulance

(despite his failure to deny this at the initial disciplinary interview); and that he has no knowledge another employee completed the assignment (which is irrelevant, and does not contradict the report by the co-worker who finished the job). Pl. Ex. 51, Leonard aff. at ¶¶ 20-25; Pl. Ex. 70-73. Mitria was on vacation when this occurred. Pl. Ex. 51, Leonard aff. at ¶ 25. In response to Mitria's request that Leonard fill out an incident report, Leonard wrote there "was no incident, but a discussion about work, and a printing job." Pl. Ex. 72. Leonard offers no evidence Mitria did not honestly believe Urbano and Zanin's statements that Leonard was given a job assignment, failed to complete it, repeatedly lied about completing it, became angry and hostile when confronted with the fact that he did not complete the assignment; and another employee completed the assignment. Further, Leonard offers no competent evidence to support a reasonable inference that twelve-months probation was retaliatory or discriminatory.

Finally, Leonard asserts as retaliatory various denials of overtime opportunities and temporary assignments carrying higher rates of pay. These instances began in January 1999, when a level seven employee in the reprographics darkroom was on vacation for two days. The only conceivable evidence of retaliation against Leonard for Mitria's assignment of work that Andrich and Gean performed (instead of Leonard, who could not) was Mitria's accurate prediction that Leonard would file a grievance. Leonard offers nothing to show Mitria's reason for giving Andrich and Gean darkroom work was pretextual.

In March 2000, Leonard contends Mitria asked that Gean, who has less seniority, be trained in the darkroom. Although this appears to conflict with Leonard's assertion that Gean worked in the darkroom well over a year prior to March 2000, Leonard filed a grievance arguing he should have been asked because of his seniority, and requested "to be made financially whole, [because he is] consistently losing money with this illegal ongoing practice." Pl. Ex. 57. Leonard did not complain of a failure to be trained. *Id.* In fact, the entire grievance is dedicated to Mitria's alleged "illegal seniority practices." *Id.* Leonard presents no evidence that Mitria's decision to train Gean was discriminatory or retaliatory.

In August 1999, Leonard filed a grievance complaining that Mitria assigned two white employees at lower grade levels a "grade 7 press" for five days. Pl. Ex. 54. Leonard wrote that he "has been complaining constantly about the blatant disrespect by manager Joe Mitria for union guidelines and employees. [Leonard has] . . . more seniority than the other two employees, and yet [he] was never

45

asked to run the grade seven jobs." *Id.* Mitria states that the white employees were put on the press to train. Def. Ex. 7, Mitria dep. at 268. Further, Mitria testified that there is no "grade 7 press" because the rate of pay employees receive is determined by the type of printing job performed, not the machine used to perform it. Def. Ex. 101, Mitria aff. at ¶ 4. Leonard offers no evidence that the two employees were not on the press to train nor that the jobs they performed constituted work warranting level seven pay. Nor does Leonard offer evidence that Mitria's conduct was retaliatory, or that Mitria's reasons for not filling one position and filling the other were pretextual.

In sum, it appears at best that Leonard's chronic complaints concern collective bargaining agreement seniority or pay issues, not race discrimination. Overall, Leonard fails to offer evidence the reason he did not receive any of the other alleged overtime opportunities or temporary assignments was a pretext for race discrimination. Conversely, the CTA has clearly established legitimate, non-discriminatory reasons for its decisions in dealing with a problem employee.

## IV    The *Monell* motion

In a separate motion, the CTA seeks summary judgment against all plaintiffs on their claims that conduct violative of §§ 1981 and 1983 by CTA employees is imputed to the CTA because it acted pursuant to a discriminatory municipal policy or custom. *Monell v. Department of Social Serv.*, 436 U.S. 658, 690-94 (1978); *Nabola v. CTA*, 10 F.3d 501, 509 (7th Cir. 1993). The CTA contends there is no evidence of a CTA policy or custom of discrimination. For the reasons stated with respect to plaintiffs' failure to present any disputed issue of material fact regarding their various discrimination and retaliation claims, the CTA is entitled to judgment as a matter of law on all *Monell* claims. Not only is the evidence insufficient to show any constitutional deprivation, but plaintiffs also fail to offer any probative evidence to establish that the CTA had a policy or custom of discriminating against its African-American employees or that a CTA policy maker was responsible for any of the challenged employment decisions. The *Monell* criteria for municipal liability are simply not present.

## **CONCLUSION**

The CTA's four motions for summary judgment are granted.

ENTER:

Suzanne B. Conlon
United States District Judge

April 4, 2001

47